UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | No. 04-10345-NMG |
| v. | ) ) ) | |
| MOHAMMED ABDUL RASHEED QUARAISHI | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MOHAMMED ABDUL RASHEED QUARAISHI'S
<u>MOTION TO VACATE SEIZURE WARRANT OR, ALTERNATIVELY, FOR
EVIDENTIARY HEARING</u>**

On November 18, 2004, Defendant Mohammed Abdul Rasheed Quaraishi ("Rasheed") and his two brothers, Aziz and Qaiyum, were indicted for "encouraging and inducing aliens to come to, enter, and reside in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). On November 1, 2004 (pre-indictment), the Government sought – and this Court issued – a warrant, authorizing seizure of "the contents" of two numbered bank accounts maintained at Charter One Bank (Chicago, IL; hereinafter, the "Seizure Warrant") – Rasheed's personal account; and Rasheed's corporate (MAQ Technologies, Inc., Rasheed's computer consultant company ("MAQ"), of which Rasheed is sole principal) account. The aggregate amount seized, and held today by the government, came to
$107,792.40.

The Government sought this warrant, accompanied by case agent affidavit alleging "probable cause to believe" that the contents of these accounts "were involved in and were used to conduct and to facilitate money laundering activities, in violation of 18

U.S.C. § 1956" (Aff. of Special Agent Richard M. Deasy, ¶¶ 3, 4). The Indictment sets forth *no* criminal forfeiture count on these monies; rather, the Government has since announced its intention to pursue these monies by way of civil forfeiture proceedings.

As will be conclusively demonstrated below, the funds seized from Rasheed's personal and corporate bank accounts were *not* acquired by means of any illegal activity, much less any "money laundering activities," as alleged by the Government. As is established by means of Rasheed's Affidavit (submitted herewith, **Ex. "A"**); and Rasheed's personal (true copy, **Ex. "B"**) and MAQ (true copy, **Ex. "C"**) bank records, *all* of the monies taken and yet held under the Seizure Warrant (collectively the "Monies") derive directly from one of two demonstrably legitimate sources. Particularly, the Monies constitute either (1) payments to MAQ from MAQ clients for services performed; or (2) bank loans or personal loans (from one or more (identified) individuals, with whom Rasheed has a personal relationship) to Rasheed, to help MAQ Technologies, Inc. meet payroll.

Here, absolutely *none* of the funds seized derived from any illegitimate source; *a fortiori*, no argument can be made that these monies are "subject to forfeiture" – under either 18 U.S.C. § 981 (civil forfeiture) or 18 U.S.C. § 982 (criminal forfeiture) as "proceeds of unlawful [*i.e.*, money laundering] activity." Likewise, where all of the funds seized are shown to be from legitimate sources, and thus, untainted, no "commingling" argument can be advanced (*i.e.*, the Government may not say that even if *some* of the monies in an account are shown to have come from legitimate sources, perhaps others in the same account were from "tainted" sources; and thus the Government may not claim that Rasheed "pooled" the funds to disguise the nature and

2

source of the "tainted" monies). Accordingly, the Government may not be heard to argue that the Monies are thus subject to forfeiture as "property *involved in*" certain specified unlawful activity. *See, e.g., United States v. McGauley*, 279 F.3d 62, 75-76 (1st Cir. 2002). On this record, therefore, Rasheed is entitled to release to him, of all of the monies held under the Seizure Warrant.

Alternatively, Rasheed has – on this record – clearly established a *bona fide*, (more than) sufficient basis on which to call into question the correctness of the Government's claims, submitted *ex parte*, in support of the Seizure Warrant. Accordingly, due process entitles Rasheed to an evidentiary hearing at which the government will be called upon to adduce sufficient evidence of "probable cause" as to continued, pre-trial seizure of the Monies.

## I. BACKGROUND

The Monies are being held solely by way of the Seizure Warrant. The Indictment in this case was returned on November 19, 2004; it does not include a forfeiture count with respect to the Monies. The Government is thus not seeking to forfeit the funds criminally. Rather, the Government has only announced an intent to proceed with a civil (in rem) action against the funds.[1]

Rasheed, an Indian national with a bachelor's degree in computer science, has resided in the United States since 1994. (Quaraishi Aff. ¶ 1.) He is married and has two children. Since 2000 Rasheed has been the President and sole shareholder of MAQ. (Quaraishi Aff. ¶ 1.) MAQ is a Massachusetts corporation with its principal place of business in Illinois. (Quaraishi Aff. ¶ 1.) It was formed to provide computer consulting

---

[1] The Government has since indicated that it has commenced a civil forfeiture action against the Monies. Neither Rasheed nor counsel has, to date, received notice of any such action.

services.  Prior to the Seizure Warrant in this case, MAQ employed or contracted for the services of approximately sixty (60) consultants and had a roster of approximately thirty (30) to forty (40) clients.[2]  (Quaraishi Aff. ¶ 1.)

On or about November 3, 2004, Rasheed received notice that his bank – Charter One Bank, N.A. of Illinois – had "closed" his personal and corporate bank accounts, at the direction of the United States District Court for the District of Massachusetts and in compliance with a Seizure Warrant served on Charter One Bank.  (Quaraishi Aff. ¶ 2.)  Thereafter, Charter One Bank's legal department forwarded Rasheed a copy of the Seizure Warrant.  (Quaraishi Aff. ¶ 2.)  At the time of the seizure, Rasheed's personal account contained approximately $4,468.18; the MAQ corporate account contained approximately $103,324.22.  (Quaraishi Aff. ¶ 3.)

On or about November 9, 2004, Rasheed met with and sought to retain the law firm of Kelly, Libby & Hoopes, P.C. for the purpose of representing both himself and his company in connection with anticipated efforts to lift or otherwise release the Seizure Warrant on the aforesaid accounts.  (Quaraishi Aff. ¶ 4.)  However, on or about November 19, 2004, the Government took Rasheed into custody on an arrest warrant issued in connection with the Indictment.  (Quaraishi Aff. ¶ 4.)  Shortly thereafter, Rasheed sought to engage the services of Kelly, Libby & Hoopes, P.C. to represent him.  (Quaraishi Aff. ¶ 4.)  To that end, Rasheed looked to the funds held by virtue of the Seizure Warrant to be earmarked for anticipated fees and costs of representation.  (Quaraishi Aff. ¶ 4.)  If the Court releases Rasheed's personal and corporate bank accounts at Charter One Bank, Rasheed will direct those funds to a client trust account, to

---

[2] Today MAQ employs or contracts for the services of approximately twenty (20) consultants and has a roster of approximately twenty-five (25) clients.

make them available to pay defense fees and costs to Kelly, Libby & Hoopes, P.C. in connection with this matter. (Quaraishi Aff. ¶ 9.)

Rasheed has virtually no other assets with which to satisfy the fees and costs anticipated to be incurred in connection with this matter *other* than the monies seized pursuant to the Seizure Warrant. (Quaraishi Aff. ¶ 5.) Specifically, Rasheed's other substantial assets consist of the following:

    a.    His sole residency at 1681 Bloomingdale Road, Glendale Heights, Illinois 60139 in which he mortgaged the entirety of his equity in support of his release in connection with this matter;

    b.    Another bank account belonging to MAQ that is not sufficient to cover all of the company's current payroll and business-related obligations; and

    c.    Three brokerage accounts with a combined value of approximately $5,867.30.

(Quaraishi Aff. ¶ 5.)

The Government supported the Seizure Warrant by means of an Affidavit of Special Agent Richard M. Deasy. In his affidavit, Special Agent Deasy stated that Rasheed and his brothers used his corporate and personal accounts to "conduct the fraudulent visa scheme," whereby Rasheed would allegedly pay out fraudulent pay stubs from his corporate account and then receive back, via his personal account, payments from aliens for these pay stubs. (Aff. of Special Agent Richard M. Deasy, ¶ 8.) To the contrary, as will be shown below, all of the funds held under the Seizure Warrant came from demonstrably legitimate sources and thus are *not* tainted as alleged in the affidavit. (Quaraishi Aff. ¶ 6.)

5

MAQ's business consists of computer consulting work for large companies, which is contracted out to MAQ through vendors. (Quaraishi Aff. ¶ 6.) Most of the funds deposited into Rasheed's corporate account for the month preceding the date of seizure ($325,446.65) are derived directly from checks from those vendors. (Quaraishi Aff. ¶ 6.) Other portions of the funds were derived from payroll tax refunds ($5,222.30) from Rasheed's payroll service company (Paychex). (Quaraishi Aff. ¶ 6.) The rest of the funds consist of loans ($59,000), either from Rasheed, personal friends, or a bank, for the purposes of helping MAQ, a relatively new business, meet payroll. (Quaraishi Aff. ¶ 6.) Likewise, all of the funds deposited into Rasheed's personal account are derived from MAQ. (Quaraishi Aff. ¶ 6.)

The funds in Rasheed's personal bank account were derived as demonstrated in the bank records attached as Exhibit B. (Quaraishi Aff. ¶ 7; **Ex. "B."**) Specifically, the deposits into Rasheed's personal bank account for the month prior to the seizure (totaling $10,994.90) were derived as follows:

    a.    A $2,000.00 deposit on October 7, 2004 from MAQ as repayment for loan;

    b.    A $3,994.90 deposit on October 14, 2004 from MAQ for salary;

    c.    A $1,000.00 deposit on October 14, 2004 from MAQ as repayment for loan; and

    d.    A $4,000.00 deposit on October 19, 2004 from MAQ as repayment for loan.

    e.    A $3,000.00 deposit on October 25, 2004 from MAQ as repayment for loan.

(Quaraishi Aff. ¶ 7; **Ex. "B."**)

The funds in the MAQ corporate account were acquired by the means demonstrated in the bank records attached as Exhibit C. (Quaraishi Aff. ¶ 8; **Ex. "C."**) Specifically, the deposits into Rasheed's corporate bank account for the month prior to the seizure (totaling $389,668.95) were as follows:[3]

    a.    A $15,652.85 deposit on October 1, 2004 from certain vendors described in Exhibit C1;

    b.    A $113,565.95 deposit on October 4, 2004 from certain vendors described in Exhibit C2;

    c.    A $2,847.50 deposit on October 7, 2004 from a vendor;

    d.    A $2,919.79 deposit on October 8, 2004 from Paychex as refund for payroll taxes;

    e.    A $533.81 deposit on October 8, 2004 from Paychex as refund for payroll taxes;

    f.    A $11,875.00 deposit on October 8, 2004 from certain vendors described in Exhibit C3;

    g.    A $8,800.00 deposit on October 8, 2004 from certain vendors described in Exhibit C4;

    h.    A $16,004.00 deposit on October 12, 2004 from certain vendors described in Exhibit C5;

---

[3] The attached exhibits consist of true copies of Rasheed's corporate bank statements for October and November 2004 followed by certain numbered exhibits with the deposit slip and copies of the checks for that individual deposit. There are some deposits for which there is no check or no numbered exhibit at all; this is the case because the transaction was either electronic (as noted in the bank statement) or a copy of the check was beyond reach (*i.e.* all checks were returned to the issuer after being deposited).

i.  A $3,580.00 deposit on October 12, 2004 from certain vendors described in Exhibit C6;

j.  A $11,960.00 deposit on October 13, 2004 from certain vendors described in Exhibit C7;

k.  A $4,320.96 deposit on October 14, 2004 from a vendor;

l.  A $1,027.07 deposit on October 15, 2004 from Paychex as refund for payroll taxes;

m.  A $13,440.00 deposit on October 15, 2004 from certain vendors described in Exhibit C8;

n.  A $2,000.00 deposit on October 18, 2004 from Rasheed's personal account as a loan to help meet payroll;

o.  A $38,090.88 deposit on October 18, 2004 from certain vendors described in Exhibit C9;

p.  A $17,160.00 deposit on October 18, 2004 from certain vendors described in Exhibit C10;

q.  A $25,000.00 deposit on October 18, 2004 from Syed Hussain as loan to help meet payroll;

r.  A $741.63 deposit on October 19, 2004 from Paychex as refund for payroll taxes;

s.  A $17,638.00 deposit on October 19, 2004 from certain vendors described in Echibit C11, and a $12,000 loan from Sameer Kheja to help meet payroll;

t.  A $1,423.20 deposit on October 21, 2004 from a vendor;

u.     A $5,440.00 deposit on October 22, 2004 from certain vendors described in Exhibit C12;

v.     A $21,542.00 deposit on October 25, 2004 from certain vendors described in Exhibit C13;

w.     A $3,068.00 deposit on October 28, 2004 from a vendor;

x.     A $26,688.00 deposit on October 29, 2004 from certain vendors described in Exhibit C14 and a $20,000 loan from Fleet to help meet payroll; and

y.     A $24,350,31 deposit on November 1, 2004 from certain vendors described in Exhibit C15.

(Quaraishi Aff. ¶ 8; **Ex. "C."**)

## II.    ARGUMENT

On these record facts, Rasheed is entitled to immediate return of the Monies. Alternatively, Rasheed is entitled to an evidentiary hearing and, thereafter, the release of his seized assets pursuant to the Fifth and Sixth Amendments to the United States Constitution.[4]  The Supreme Court held, in two companion cases in 1989, that it was not a violation of the Sixth Amendment for the Government to seize assets earmarked for paying attorney fees where those assets have been *adjudged* forfeitable, *see Caplin & Drysdale v. United States*, 491 U.S. 617, 632 (1989), or where probable cause exists that they *will* be forfeitable, *see United States v. Monsanto*, 491 U.S. 600, 615 (1989) ("*Monsanto III*").  However, the Supreme Court left open the issue of whether the Due

---

[4] The civil forfeiture statute, which also provides for the release of seized property prior to trial, is inadequate in this case. *See* 18 U.S.C. § 983(f). Section 983(f) provides that, upon the satisfaction of certain conditions, the claimant may send a request for the return of his property to the appropriate official, and, if his property is not released within fifteen days of that request, he may file a petition for the return of his property. However, one of the conditions of § 983(f) is that "the property will be available at the time of trial." *See* § 983(f)(1)(B). Here, Rasheed seeks the release of his funds to satisfy defense fees and costs. This statutory remedy is therefore inadequate to address Defendant's claim, because Defendant seeks legal representation in connection with this matter.

9

Process Clause requires a pretrial evidentiary hearing to rebut the issue of probable cause and to establish that the assets are needed for purposes of retaining defense counsel. *See Monsanto III*, 491 U.S. at 615 n.10.

In the meanwhile, several circuits have ruled that where the defendant makes a *bona fide* showing that the Government is in error as to "taint," the Fifth and Sixth Amendments require that defendant be afforded a pretrial evidentiary hearing. After the Supreme Court's remand in *Monsanto III*, the Second Circuit directly addressed whether a pretrial evidentiary hearing is required. In *United States v. Monsanto*, 924 F.2d 1186, 1193-1194 (2d Cir. 1991) ("*Monsanto IV*"), the Second Circuit stated that *Monsanto III* "should not be read to deprecate a criminal defendant's strong and legitimate interest in ensuring that 'probable cause is adequately established' at a pretrial hearing before he is effectively deprived of counsel of choice as a result of a pretrial restraint of his assets." The court analyzed the issue by way of the three due process balancing factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 355 (1976): (1) the private interest to be affected by the official action; (2) the risk of erroneous deprivation of that interest and the probable value of procedural alternatives; and (3) the government's interest. *Id.* at 1193. The court then concluded that the Fifth and Sixth Amendments require a pretrial hearing to reexamine the probable cause determinations (made, in that case, by the grand jury in the indictment) that preclude access to assets needed to retain counsel of choice. *Id.* at 1195.

Likewise, the Tenth Circuit, in *United States v. Jones*, 160 F.3d 641, 643 (10th Cir. 1998), held that "due process requires a district court to conduct a post-restraint, pretrial adversarial hearing before continuing to freeze assets that a defendant allegedly needs for legal and living expenses." In *Jones*, the district court granted the

government's *ex parte* motion government to seize $1.5 million of the defendants' assets (following an indictment that included a criminal forfeiture count that alleged those assets were gross proceeds of the underlying offense) and rejected the defendants' motion for a post-restraint, pretrial hearing to challenge the restraint and obtain the assets for legal and living expenses. *Id.* at 643-644.[5]

The *Jones* court outlined the burden-shifting framework to take place with respect to such a hearing: the defendant bore the *initial* burdens of establishing that she needed the assets to obtain counsel (and provide for herself and her family) and that there was a "bone fide reason" to believe the grand jury "erred" in determining that the restrained assets constituted or were derived, either directly or indirectly, from gross proceeds traceable to the commission of the offense. *Id.* at 647. With respect to the defendant's burden, the court stated that the defendant need only produce sufficient grounds on which to show "error" as to tainted assets; on such, the government would thereafter be called upon to establish probable cause that the restrained assets are indeed derived from the underlying offense.[6] *Id.*

The same form of hearing – with the government bearing the ultimate burden of proof – obtains in the *civil* forfeiture context, as well. In *United States v. Michelle's Lounge*, 39 F.3d 684 (7th Cir. 1994), the Seventh Circuit addressed the process to be followed where a challenge to seized assets was mounted in civil, as opposed to criminal,

---

[5] Of particular note, the government in *Jones* identified three interests it claimed weighed against a post-restraint, pre-trial hearing: (1) preserving forfeitable assets; (2) avoiding premature disclosure of its case; and (3) preservation of prosecutorial resources." *Id.* at 647. While the court considered the first and third interests to be important, with respect to second it stated that "[w]orries of premature disclosure ring hollow in a system where the government is permitted few surprises." *Id.* The court then concluded that the proper balance of private and government interests required a hearing. *Id.*

[6] The court also stated that, with respect to these showings, the district court could receive and consider evidence that would otherwise be inadmissible under the Federal Rules of Evidence. *Jones*, 160 F.3d at 647-648.

11

forfeiture proceedings. The *Michelle's Lounge* court, as had the courts in *Monsanto IV* and *Jones*, analyzed the issue by way of the three due process balancing factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 355 (1976). *See id.* at 697; *Monsanto IV*, 924 F.2d at 1193; *Jones*, 160 F.3d at 645. With respect to the private interest affected by the official action, the court stated that "[a] criminal defendant whose assets are seized pursuant to civil forfeiture, based on the same illegal activities underlying the criminal action, is in the same position as a criminal defendant whose assets are seized pursuant to criminal forfeiture." *Id.* at 697. Under both scenarios, the court explained, the defendant is being deprived of is "weighty" interest in obtaining counsel of choice. *Id.* at 697-698.

Significantly, the *Michelle's Lounge* court also analyzed the difference between civil and criminal forfeiture with respect to the deprivation of the right to counsel of choice and the procedural alternatives available to protect that right. Specifically, the court pointed out that unlike in criminal forfeitures, which are commenced upon the filing of an indictment that itself emerges from a non-adversarial process (*i.e.* the grand jury), civil forfeitures are commenced with the filing of a complaint, which is supported by an affidavit upon which a judge must find probable cause to issue a warrant for the seizure of the property. *Id.* at 698-699. The government there contended that civil forfeiture already incorporates procedural safeguards absent in the criminal forfeiture context, because of the initial *ex parte* finding of probable cause by a judge and the possibility of eventual summary judgment proceedings. *Id.* at 699. However, the court stated that "[a]n *ex parte* determination of probable cause, whether made by a grand jury or a judge, does not address the concern that *ex parte* proceedings pose *a substantial risk of error*." *Id.* (emphasis supplied). Further, with respect to the possibility of summary judgment

12

proceedings, the court pointed out that they may be a long time coming, particularly where parallel civil and criminal proceedings require the civil case to be stayed pending the criminal trial. *Id.* The court stated that "[a]n 'opportunity to be heard' after the criminal trial is useless" and that "'the defendant *needs the attorney now if it is to do him any good.*'" *Id.* (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 726-727 (7th Cir. 1988)) (emphasis supplied).

Lastly, the Seventh Circuit concluded that the government's interest did not relieve it from participating in a post-seizure adversary hearing. The court explained that to receive a hearing the defendant must first demonstrate that he needs the funds to obtain counsel. *Id.* at 700-701. The court further explained that the defendant would then have the opportunity to rebut the government's showing of probable cause. *Id.* at 701. However, the court explained, "if the defendant successfully rebuts the government's showing of probable cause and the government cannot or chooses not to bring forth additional evidence, due process requires that *sufficient assets be released* to remedy the deprivation of assets needed to pay a defense attorney's reasonable fees." *Id.* (emphasis supplied).[7]

---

[7] The Fourth Circuit, in *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), followed the Seventh Circuit's decision in *Michelle's Lounge*. In that case, the defendant's assets were seized pursuant to civil forfeiture based on the same allegedly illegal activities underlying the criminal indictment. *Id.* at 804. The court also recognized that, "[w]hile *Caplin* made absolutely clear that there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, [the defendant] still possesse[d] a qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice." *Id.* Accordingly, the court held that the defendant was entitled to a hearing pursuant to the Due Process Clause. *Id.* at 806. *See also United States v. Jamieson*, 189 F. Supp. 754, 757 (N.D. Ohio 2002) (following *Jones* and holding that a pretrial hearing is required once the defendant makes preliminary showings that no other assets are available from which the defendant may retain counsel of his choosing (or support himself or his family) and that the grand jury erred in the indictment with respect to the forfeiture of those assets); *United States v. Causey*, 309 F. Supp.2d 917, 927 (S.D. Tex. 2004) (same); *but see United States v. Register*, 182 F.3d 820, 835 (11th Cir. 1999) (recognizing that "[w]e appear to be the only circuit holding that, although pretrial restraint of assets needed to retain counsel implicates the Due Process Clause, the trial itself satisfies this requirement," but stating that "in the appropriate case, we perhaps should re-examine [that holding] in light of *Monsanto III* and its progeny . . . .").

13

While courts within the First Circuit have yet to address this particular issue, they have addressed some of the principles at stake here. *See United States v. Eagleson*, 874 F. Supp. 27, 31 (D. Mass. 1994) (Gorton, J.) (noting, but with defendant *in absentia*, ruling no need to reach the issue of whether the Due Process Clause entitled a defendant to a hearing to challenge an *ex parte* order restraining assets). In *United States v. Siegal*, 974 F. Supp. 55, 58 (D. Mass. 1997) (Saris, J.), the court held that the Due Process Clause required that third parties receive a pretrial opportunity to challenge a restraining order. In so holding, the court cited with approval *United States v. Crozier*, 777 F.2d 1376, 1382-84 (9th Cir. 1985), for the proposition that it was a violation of due process to not guarantee third parties *or criminal defendants* an opportunity to challenge a post-indictment restraining order prior to trial.

Rasheed has made the requisite preliminary showings as to government "error." Here, the record conclusively establishes that (1) the seized funds are *not* tainted and (2) they are needed for defense fees and costs in the instant criminal action. As demonstrated by Rasheed's affidavit and accompanying bank records, all of the funds in the accounts have legitimate, untainted sources. Further, as demonstrated by his affidavit, Rasheed effectively has no other assets besides the seized accounts with which he can satisfy the payment of attorney fees. Rasheed has thus made his *bona fide* showing of "error" in the Government's materials, submitted in support of the Seizure Warrant, and is thus entitled, at a minimum, to an evidentiary hearing at which the Government must carry its burden to show the contrary.[8]

---

[8] The Government is not entitled to rely upon a substitute asset theory or a commingling theory. This is not a money laundering case, and there has been no conviction. Further, even if the Government were allowed to rely upon a commingling theory, the facts would show that this is not a case in which a single "asset" – sought to be forfeited – was purchased with combined "clean" and "tainted" funds, but, rather, a case in

### III.  CONCLUSION

For the foregoing reasons, an evidentiary hearing should be held on this matter and Rasheed's assets should be released.

Respectfully submitted,<br>
MOHAMMED ABDUL RASHEED QUARAISHI<br>
By his attorneys,<br><br>

/s/ Frank A. Libby, Jr.<br>
Frank A. Libby, Jr. (BBO No. 299100)<br>
Nicholas A. Klinefeldt (BBO No. 647422)<br>
**KELLY, LIBBY & HOOPES, P.C.**<br>
175 Federal Street<br>
Boston, MA  02110<br>
Telephone:  (617) 338-9300

Dated: April 11, 2005

---

which there are more than sufficient "clean" funds to support the release of the seized funds. *Compare United States v. Moore*, 27 F.3d 969, 976-977 (4th Cir. 1994), *with United States v. Loe*, 248 F.3d 449, 466-467 (5th Cir. 2001).  The facts would also show that this is not a case in which "clean" funds were commingled with "tainted" funds for the *purpose* of concealing the "tainted" funds. *See United States v. McGauley*, 279 F.3d 62, 69-72 (1st Cir. 2002).

15