UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No. 04-10345-NMG |
| | ) | |
| MOHAMMED ABDUL RASHEED QURAISHI, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S OPPOSITION TO MOTION TO VACATE SEIZURE WARRANT
AND/OR HOLD AN EVIDENTIARY HEARING AND MEMORANDUM IN SUPPORT

NOW COMES the United States and respectfully requests this Court DENY Defendant's Motion to Vacate Seizure Warrant or for Evidentiary Hearing. Defendant's motion is both procedurally and substantively flawed, and given these frailties, does not merit a hearing at this time.

As reasons therefore, the United States states the following:

1. The Seizure Warrant issued by this Court on November 1, 2004, was properly issued and remains valid under authority of 18 U.S.C. §981 and 18 U.S.C. §982 and Federal Rule of Criminal Procedure 41. Accordingly, the objects of the seizure warrant, the contents of two bank accounts, were lawfully seized and retained.

2. On November 18, 2004, the Defendant was indicted by a Federal Grand Jury for Encouraging and inducing Aliens to Come to, Enter, and Reside in the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(iv), a specified unlawful activity proscribed under the money laundering statute, 18 U.S.C. §1956.

3. On March 18, 2004, the objects of the seizure warrant became the objects of a parallel Civil Proceeding, United States v. $103,342.22 in U.S. Currency et al., 05-CV-10515-REK, and

that forum is more appropriate for this issue.

4. Defendant has failed to meet his burden of production to: 1) challenge the probable cause that he used the subject accounts in his illegal scheme which render them subject to forfeiture, and 2) aver sufficient facts which demonstrate that such monies are necessary to pay for counsel pursuant to the Sixth Amendment to the Constitution of the United States. *See United Staes v. Jones,* 160 F.3d 641 (10th Cir. 1998)*; United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001).

5. The Defendant has failed to show authority to convert assets of a subject corporate account for personal expenditures, and use of this account remains under ongoing criminal investigation.

6. The property seized is properly retained by the government as commingled money. 18 U.S.C. §1956, 18 U.S.C. §984, *United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002).

**WHEREFORE**, the United States respectfully submits that Defendant's motion be **DENIED**.

## DISCUSSION

### I.    Introduction

The subject bank accounts, an account in the name of Defendant Mohammad Abdul Rasheed Quraishi and a corporate account in the name of MAQ Technologies, Inc., were seized from Charter One Bank in Illinois, pursuant to a valid seizure warrant from this Court issued on November 1, 2004 pursuant to both criminal and civil forfeiture statutes, 18 U.S.C. §§981, 982 and Federal Rule Criminal Procedure 41. The Affidavit in support of that warrant described an elaborate visa-fraud money laundering scheme in which Defendant and others deposited monies

which were proceeds from his illegal enterprise into the subject accounts dating through June

2004.[1] (See Exhibit A - Copy of Seizure Affidavit.)  That Affidavit demonstrated that some of

the monies deposited into these accounts, were the proceeds of and involved in money

laundering, as described in 18 U.S.C. §1956.  On November 18, 2004, the Defendant was

subsequently indicted for charges relating to illegally encouraging aliens to enter the United

States, 8 U.S.C. §1324, and other charges. (See Exhibit B - Indictment.)  The subject accounts

were not included in the criminal indictment at that time, in favor of a Civil Complaint filed on

March 18, 2005 against the monies seized.  (See Exhibit C - Civil Complaint.)  The Government

has consistently notified Defendant's counsel, and maintains before this Court, that it believes

Defendant's criminal activities, which remain under investigation, have tainted the money in the

subject accounts and should not be released from forfeiture proceedings.

Defendant contends, that as a matter of law, this Court illegally ordered seizure of monies

based on the factual basis outlined in the seizure warrant, because the Court, in both its civil and

criminal capacities, had relied upon a legal rationale which is deficient.[2]  The argument goes that

---

[1]The Defendant is alleged to have used certain bank accounts between June 2003 and May 2004, in order to "clean" monies which both facilitated and were proceeds of a criminal scheme.  In the scheme, Defendant falsely paid salary to an individual who Defendant falsely sponsored to enter and reside in the United States, and then demanded the money, plus an additional sum back from the sponsored alien.  These monies flowed through the subject accounts.  Evidence of this scheme was demonstrated beyond the probable cause standard in the indictment, civil forfeiture pleading, seizure warrant and arrest warrant.  In addition, evidence was shown to the Court, and has been further developed, that Defendant's fraud was much more widespread, such that scores of additional alien employees were fraudulently sponsored to work at client companies in the United States through Defendant's company.  The money which flowed from the contracts of those employees and client companies were deposited, and apparently continue to be deposited, into MAQ Technologies' corporate accounts.  Defendant now alleges that the evidence is insufficient to support the legal basis of forfeiture, and that the grand jury and the civil and criminal courts were hoodwinked as a matter of law.

[2]The defense posits, without authority, that by virtue of Defendant's provision of bank statements at the time of the seizure, that the Government may not allege that these monies are "commingled" with those involved in a specified unlawful activity.  This argument is refuted below.  Moreover, the Government has demonstrated that the money involved in the unlawful activity, encouraging aliens to enter or reside in the U.S., first was deposited into Defendant's personal bank account and then commingled with money in MAQ Technologies' corporate account with other money which itself may be money involved in unlawful activity.  This activity, need not be separately

3

because the Defendant has not been indicted for money laundering, the monies seized from a corporate account should be relinquished for his personal legal defense. Alternatively, Defendant requests an evidentiary hearing for the government to remonstrate the probable cause previously presented to the Court in this above-captioned matter as well as a civil forfeiture proceeding.

To the contrary, the bank accounts subject to forfeiture have been properly retained by the Government, Defendant's motion has not ripened, and he has failed to allege sufficient facts to merit a hearing on the issue. Moreover, Defendants' arguments are transparent cover for the Defendant's attempt to tap into a resigned pot of money in order to: pay his counsel, exhaust a supply of money which will not likely remain available for forfeiture at the conclusion of the instant criminal matter, and/or to exploit an opportunity for cross-examination and to otherwise adversely impact the investigation and prosecution strategy. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631 (1989) ("It is our view that there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense. Otherwise, there would be an interference with a defendant's Sixth Amendment rights whenever the Government freezes or takes some property in a defendant's possession before, during, or after a criminal trial.")

## II.    Defendant's Motion is Procedurally Flawed

### A. **This Issue Should Be Resolved In The Civil Case**

At the onset, Defendant's Motion is improperly filed in this criminal matter.  As

---

charged criminally in order to satisfy the definition of money laundering under 18 U.S.C. §1956.

previously indicated, the Government anticipated and did file a Civil Complaint pursuant to 18

U.S.C. §983 against the money seized in this case.  Insofar as a civil proceeding has commenced

against the subject accounts, and that a criminal forfeiture count has not been sought, the

appropriate venue for challenging pre-trial restraint of property subject to forfeiture should be

that forum which will ultimately determine post-trial disposition.  *See United States v. Michelle's

Lounge (Michelle's Lounge II)*, 126 F.3d 1006 (7th Cir. 1997).  The statutory infrastructure to

adjudicate interests in the *res*, especially where corporate assets and creditors are at issue, is

much more suited to the civil realm.  *See* 18 U.S.C. §§983, 984.  Although the issues are

interrelated in both the civil and criminal session, the property itself is currently subject to

adjudication in the civil session.  *See* 18 U.S.C. §983(a)(3)(c).  Moreover, because of this

interrelationship, one forum should not be an end-run around adversarial procedures applicable

to the other. *See United States v. Four Contiguous Parcels*, 191 F.3d 461 (6th Cir. 1991)(stating

the defendant has no right to insist that the Government use criminal forfeiture instead of

maintaining parallel civil forfeiture that was filed first.)  To the extent that a constitutional claim

is made with respect to the Defendant's need to have money for criminal defense counsel, this

issue as well, may be properly adjudicated in the civil proceeding.

B. **Defendant fails to show standing to exercise will over Corporate Account**

It is the burden of the Defendant to demonstrate standing to contest the seizure of the

subject money.  In this case, the money seized from the corporate account's, was not his – rather

by concession, it was the Corporation's.[3] Although the government acknowledges that Defendant

exercised *de facto* control over the subject accounts, the burden remains on the Defendant to

---

[3]  One of the subject Charter One Bank accounts is registered to MAQ Technologies – it holds the lion's
share of money, and is consequently the account of particular interest in Defendant's motion.

demonstrate that he had actual authority and legal authority to exercise dominion over this account, before he can contest the propriety of its seizure.  Although Defendant has represented in his affidavit that he is the sole principal of the company, he has not provided a factual basis for his right, let along an exclusive right, to dispose of money in that account at his will.  As a corporate officer in a company which has credit liabilities (Quaraishi Aff. ¶5(b)), he can hardly co-opt and convert the corporate monies for his personal legal defense.

In fact, evidence obtained by the Government demonstrates that defendant's access to the MAQ corporate account was not exclusive, as co-defendant Mohammad Abdul Qayium Quraishi managed numerous financial transactions for MAQ Technologies.  MAQ either was a legitimate corporation, or it was a shell designed to shield its principals' assets.  It cannot be, as Defendant would have it, both;  Defendant has not averred sufficient facts to demonstrate his actual and legal authority to use its assets at his personal will.

## III.    Defendant's Motion Must Fail on Its Merits

### A. Defendant has not met Due Process requisites for an Evidentiary Hearing

When determining the requirement of a hearing pursuant to principles of Due Process, three factors are considered: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the ... administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 334-35 (1976).

Subsequent courts have decided that a criminal defendant's demonstrated need to pay the counsel of its choice in a criminal matter may be a sufficient private interest to merit a hearing.

6

*United States v. Michelle's Lounge (Michelle's Lounge I)*, 39 F.3d 684, 693 (7th Cir. 1994)

(when burden of production is met, due process requires a hearing on probable cause in a civil

forfeiture case if the Government has seized all of defendant's assets needed to obtain counsel in

a parallel criminal prosecution); *United States v. Michelle's Lounge (Michelle's Lounge II)*, 126

F.3d 1006 (7th Cir. 1997) (allowing hearing in Civil forfeiture case in pursuit of the release of

funds for the criminal case.)

Regardless of the forum, as a preliminary matter, a defendant must demonstrate to the

court's satisfaction that he has no assets, other than those restrained, with which to retain private

counsel.  *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998).  A Defendant must also make a

*prima facie* showing of a *bona fide* reason to believe that there was an erroneous probable cause

determination which led to the restraint.  See *Id.*  To warrant a hearing in this matter, the

Defendant must show that the probable cause outlined in the seizure warrant and/or subsequent

legal proceedings was deficient.  Without such an allegation, Defendant is not entitled to any

relief from pre-trial restraint of property, even if he wants the money to pay his lawyer. *United

States v. Melrose East Subdivision*, 457 F.3d 493 (5th Cir. 2004)*(citing Caplin & Drysdale,

Chartered v. United States*, 491 U.S. 617 (1989) and *United States v. Monsanto*, 491 U.S. 600

(1989).

Although not squarely addressed in this Circuit, the emerging rule is that a post-restraint,

pretrial hearing is required by Due Process, only if the Sixth Amendment is implicated, and only

if the defendant makes a sufficient *prima facie* showing that there is no probable cause for the

forfeiture of the restrained property.  *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998)

(defendant has initial burden of showing that he has no funds other than the restrained assets to

hire private counsel or to pay for living expenses, and that there is *bona fide* reason to believe the restraint should not have been entered.)

In this case, an evidentiary hearing is not warranted at this time or in this manner, because: the civil proceeding is the proper forum, the defendant has not met the threshold for showing a Sixth Amendment need, the defendant has not impeached the probable cause laid out to the court, and the inefficiency to court and counsel of conducting a premature adversary hearing with its attendant cross-examination of government witnesses. *See United States v. Wittig*, 2004 WL 1490406, at *2 (D. Kan. 2004) (following *Jones*; claimant has the burden of persuading the court that he has no funds with which to retain counsel of his choosing or to support himself or his family, and that there are assets that should not have been covered by the grand jury's forfeiture provisions and that therefore should not have been burdened by the restraining order); *see also In re Restraint of Bowman Gaskins Financial Group Accounts*, 345 F. Supp. 2d 613 (E.D. Va. 2004) (holding the requisite circumstances for a hearing applies equally to pre-indictment orders; that the target of the grand jury investigation wants to use the money to hire counsel is no reason to object to a restraining order if there is probable cause to believe the property is forfeitable.)

In the instant case, Defendant has not impeached any of the operative facts outlined in the affidavit in support of the seizure warrant, Civil Complaint, or grand jury indictment, which implicate the seized money. Rather, the defendant merely asserts that at a later snapshot in time, the account was void of any tainted funds. Even if these facts were taken in the best light for Defendant, he fails to diminish the probable cause outlined to the Court at the time of the seizure and at subsequent proceedings. *See United States v. McCray*, 113 Fed. Appx. 770, 2004 WL

2423736 (9th Cir. Oct. 28, 2004) (upholding district court's refusal to grant hearing regarding funds held in parallel civil case); *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993)("defendant is not entitled to a hearing unless he offers evidence as to the source of the restrained property, or his inability to compensate counsel from other funds available to him".) Consequently, Defendant's motion has not matured to an issue properly before this Court for hearing. *United States v. Monsanto*, 924 F.2d 1186, 1194 (2d Cir. 1991) (the Supreme Court's decisions in *Monsanto* and *Caplin & Drysdale* "compel a defendant to establish lack of probable cause either as to guilt or forfeitability of restrained assets in order to obtain any relief from a pretrial restraint".)

In this case, several factors patently exist which preclude his insolvency, for example: the defendant has access to other similarly-situated corporate monies which Defendant cites in his Affidavit at ¶5(b), Defendant does not show all his assets or balance sheets, Defendant does not cite family resources (including those of his siblings who can apparently pay for counsel), and Defendant's ability to presently assign to counsel his rights in the subject money, regardless of a final adjudication of forfeitability.  Moreover, inasmuch as Defendant's company MAQ Technologies, Inc. is inextricably linked with its predecessor and still affiliated company Megasystems, Inc., similarly-situated assets in that company should also be considered before deciding whether Defendant has shown that he has exhausted all other sources.  As noted above, Defendant's legal rights to spend the money from the corporate account(s) for his personal expenses, remains tenuous and unclear, even if he has done so in the past.  In any event, the corporate account, indeed the company itself, is believed by the government to have facilitated money laundering, both in pre-existing allegations, as well as further developed information.

9

Clearly, such monies cannot and should not be assigned as attorneys fees. *See In re Restraint of Bowman Gaskins Financial Group Accounts*, 345 F. Supp. 2d 613 (E.D. Va. 2004) (because property transferred to third parties is forfeitable in the criminal case under the relation back doctrine, it may be restrained even though it is held in a third party's name).  Likewise, Defendant may not seek to quickly assign away the company's coffers by ignoring other claim-holders to the money in the corporate account, nor can he ignore the evidence that the account became tainted from July 2003 through May 2004 by citing to its chastity in October 2004.  *E.g. United States v. Thomas,* 2004 WL 3059794 (S.D. Ind. 2004) (court finds it unnecessary to determine whether defendant's assertion that he lacked other funds with which to hire counsel was true because, in any event, Government's evidence established probable cause to believe the restrained property was subject to forfeiture.)

A hearing, to the extent that one is allowed, should be limited to the first prong of the *Jones* analysis discussed *infra*, that is, the need to have the seized money given to him in order to pay reasonable fees to his attorneys (assuming first, *ad arguendo,* that he has sufficient rights to the money in that account). *E.g. United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) ( following *Jones*; to satisfy Sixth Amendment requirement, defendant must show he has no access to other funds; Government has right to rebut showing of lack of funds if hearing is granted.)  Without this showing, the Court need not turn to the second prong of the *Jones* analysis, requiring a pre-trial hearing into the basis of the probable cause for retaining seized property. *Consider Monsanto* , 924 F.2d at 1196 ("if the Government succeeds in establishing probable cause, the policy favoring forfeiture precludes any constitutional requirement that equities be further weighed or balanced".)

B. **Defendant fails to demonstrate threshold need for money for counsel**

As discussed above, a defendant requesting an evidentiary hearing must first demonstrate that a) He has no funds other than the restrained assets to hire private counsel or to pay for living expenses, and that there is a *bona fide* reason to believe the restraining order should not have been entered, and b) That there is no probable cause to continue the restraint on the assets. *Jones*, 160 F.3d at 647. The defendant's demonstration of the latter prong is discounted *infra*. As for Defendant's allegation that he needs the money to pay for a lawyer of his own choice, he fails to meet a *prima facie* showing that he has no additional assets to pay for his attorney. In fact, to the contrary, in the defendant's own affidavit, he explicitly states that he (or his company) does have those assets, but that they are earmarked elsewhere. (Quaraishi Aff. ¶5(b).)[4] A mere self-serving factual assertion that one plans on assigning a sum of money to counsel is quite different from invoking the Sixth Amendment's protections. (Quaraishi Aff. ¶9.)

Even in his affidavit, Defendant has neither specifically demonstrated what his assets are, nor their values, nor are any of his allegations corroborated with any third-party documentation. (*See* Quaraishi Aff. ¶5.) Moreover, as noted *infra*, Defendant has not demonstrated his liberty to control the Corporate assets of MAQ Technologies for his personal purposes at his unilateral discretion; nor has he acknowledged the other individuals and creditors who may have an interest in the same money.

---

[4]Although Defendant described another account with which he meets his payroll obligations, this disclosure, which did not include the nature or location of the account(s) or the amount of money therein, evidences another significant source of money which is virtually identical to the account seized. (Quaraishi Aff. ¶5(b).) It too is used to pay payroll – just as he describes the previous function of the subject account. If Defendant is authorized, as he asserts, to transfer and use the monies in the subject "corporate account" for his personal legal fees, than he certainly can do the same for the active "corporate account" which he uses to pay off his company's other creditors. This would be ironic, considering he claims to have no assets to pay his attorneys.

Quite simply, the Defendant is not entitled to pay his attorneys through monies which were proceeds of or involved in specified unlawful activity. Probable cause has been shown that the seized money was tainted, and nothing has detracted from that showing. Even if the defendant has no additional untainted assets, he is not permitted to use tainted assets to exercise his Sixth Amendment right to counsel.[5] *E.g. United States v. St. George*, 241 F. Supp. 2d 875 (E.D. Tenn. 2003) (following *Jones*; defendant must make threshold showing that she lacks alternative source of funds to retain counsel *and* that there is reason to believe there is no probable cause for the forfeiture of the restrained property; denying hearing to defendant who failed to make second showing).

C. **Defendant has not met Burden of Production to Challenge Probable Cause**

As described above, the burden is on the defendant to demonstrate the lack of probable cause to seize the money. *See Jones,* 160 F.3d at 647. Probable cause was adequately demonstrated in support of the seizure warrant, grand jury testimony, civil forfeiture complaint and arrest warrant. Instead, the defendant's attempt merely demonstrates that business-related funds did go through the account some five months after the last transaction cited by the government's evidence. In fact, the records provided by the defendant, although providing attribution for the sums deposited that month, only serve to corroborate that the account was being used in furtherance of the defendant's illegal scheme. Moreover, the civil forfeiture infrastructure additionally addresses this issue by explicitly permitting property to be forfeited within a year of an offense, even if the subject bank account were cleaned and remaining monies were not directly traceable to the offense that is the basis for the forfeiture. 18 U.S.C. §984(a)-

---

[5]The Government also appreciates the myriad potential ethical conflicts when assigning contentious funds to counsel in a criminal case which remains under investigation.

(d).  The case is made *a fortiori*, where the contracts which led to the business-related funds being deposited into this account were themselves derived from visa-fraud.  The Government's theory of the case is that the defendant was operating a company which remained in business through fraud.[6]  Consequently, merely demonstrating from where funds were deposited into the subject account does nothing to detract from the defendants' use of the account in furtherance of his illegal scheme.

Examining the bank records for the month prior to seizure is self-selected by Defendant and wholly inapt. The operative time over which probable cause developed to believe the accounts were involved in money laundering activities was demonstrated to the Court for the time period from June 2003 through May 2004.  That criminal activity cannot be discounted by examining the account at the moment in time furthest removed from the criminal allegations charged in the indictment.  Taken in its most favorable light, Defendant's theory relies on the fact that by the time of the seizure in this case, the Defendant had succeeded in laundering the ill-gotten gains by disguising them through the regular course of the company business.  That theory just does not hold water to reduce probable cause, to the contrary, it proves the government's case that the business itself was used to launder money.  *See* 18 U.S.C. §1956(a)(3)(B), 18 U.S.C. §984*; See United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002)(Clarifying that, as here, sums of money involved in money laundering activities can taint sums of money in excess of the illegally derived funds)*; United States v. Tencer,* 107 F.3d. 1120, 1135 (5th Cir. 1997)*; United States v. Baker,* 227 F.3d. 955, 970 n.4 *(7th Cir. 2000); See also*

---

[6]Similarly relevant is the fact that Defendant obtained his personal immigration status in the United States through fraud, insofar as he has admitted forging his wife's signature on Immigration documents.

*United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998)("forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e. disguise the nature and source, of his scheme.")

    D.    **Commingled Money Properly Seized**

As discussed above, Defendant's basis for contending illegality in the retention of the subject accounts by the government, is that the deposits in the account over the month prior to seizure of the account were attributable to business-related transactions. This argument rejects the lawful basis of seizure and retention afforded under the forfeiture laws, and ignores that a civil basis of forfeiture may be based on charged and uncharged criminal conduct. *See* 18 U.S.C. §§ 981-984; F.R.C.P. 41. In particular, the government seized and retains the subject accounts because they were used to facilitate money laundering under 18 U.S.C. §1956, by being involved in money laundering and bearing the proceeds of money laundering. That the Defendant has not been indicted for same, to date, does naught to negate the criminal conduct recited to the Court in the Seizure Warrant and the Civil Complaint. Moreover, the basis of the money laundering nexus is that the defendant engaged in specified unlawful activity, namely the indicted conduct, encouraging aliens to come into or reside in the United States, and that these bank accounts were involved in that scheme. It was this factual pattern which led to the Grand Jury's handing up of an indictment, the warrant for the Defendant's arrest, the warrant for seizure of the subject accounts, and the Civil Complaint for same.

The legal basis for retention of these monies is sound, and has been affirmed in this Circuit. In *United States v. McGauley*, 279 F.3d 62, 65-76 (1st Cir. 2002), the First Circuit

14

squarely decided that there is no *de minimis* exception to the money laundering statute, and transactions designed to conceal or disguise the nature, location and source of the tainted proceeds were also subject to forfeiture.  The Government has alleged the Defendant's criminal activity lasted at least from June 2003 to May 2004.  The fact remains that the business, and specifically that account, was involved in money laundering for longer than the discrete period of time examined .  *See also* 18 U.S.C. §984 (dispensing with the tracing requirement in money laundering cases where bank account is seized within one year of the date when the laundering offense occurred.)  As the Fourth Circuit recently stated in *United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004), a case in which a seizure warrant based in part on money laundering was executed over a year after the predicate acts began, "[t]o accept [defendant's] staleness argument, we would have to suppose that a successful and profitable criminal enterprise simply faded away for no apparent reason."  Indeed, the Government's theory of the case includes the fact that Defendant utilized ill-gotten gains to further promote and continue his business.[7]

In *United States v. Marabella*, 73 F.3d 1508, 1516 (9th Cir. 1996), the Ninth Circuit squarely addressed this issue *vis-a-vis* the money laundering statute.  That court stated, "[w]e reasoned a rule requiring the government to segregate tainted from untainted funds would defeat the purposes of the money laundering statute. Such a rule would permit individuals to avoid prosecution simply by commingling funds. [*United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994), *cert denied,* 115 S.Ct. 1699 (1995)](*quoting United States v. Johnson*, 971 F.2d 562, 570

---

[7]In addition, as referenced in the Civil Complaint, additional evidence, including statements of co-defendant(s) witness a broader scope of fraudulent visa applications by the Defendant and others, implicating even more funds which remain under investigation by the Government.  By operation, business-related monies deposited into this subject account from contracts related to fraudulently sponsored aliens, would similarly taint the businesses finances as ill-gotten.

(10th Cir.1992)); or in the present case, simply by disbursing the illegally obtained funds from the [subject] account, depositing clean funds into that account, and then using the clean money to complete the [] transaction. This is a classic example of money laundering." Consequently, Defendant's motion too cannot be resuscitated by the transfusion of ongoing business transactions through the Charter One MAQ Technologies account.

IV.     **CONCLUSION**

**WHEREFORE**, for the reasons stated above, the United States respectfully requests this Court **DENY**, the Motion to Vacate Seizure Warrant or Alternatively, Evidentiary Hearing.


Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:     /s/ ALOKE CHAKRAVARTY
        Aloke Chakravarty
        Assistant U.S. Attorney
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        BBO# 637288
        617-748-3658


DATED: April 25, 2005

16

## AFFIDAVIT OF SPECIAL AGENT RICHARD M. DEASY

I, Richard M. Deasy, being duly sworn, hereby depose and state as follows:

1.    I am a Special Agent of the United States Bureau of Immigration and Customs Enforcement ("ICE") and have been so employed for approximately twelve years.  I am currently assigned to the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force ("JTTF") in Boston, Massachusetts.  During my employment as a Special Agent with ICE, I have been involved in numerous investigations concerning alien smuggling and the unlawful procurement of immigration benefits by means of fraud.  I have also conducted numerous investigations concerning the fraudulent procurement, sale, and distribution of United States identification documents to include passports, visas and immigration documents.  One of my responsibilities is the investigation of the fraudulent acquisition of United States visas in the context of alien smuggling and employment fraud.  In addition, my responsibilities include the investigation and detection of money laundering activities related to criminal activities involving immigration, including the procurement of fraudulent documents, alien smuggling and immigration fraud.  I have received training in the identification and tracing of illegal proceeds and I am familiar with the methods commonly used to launder proceeds of illicit activities and I have been involved in several money laundering investigations involving the proceeds of immigration-related

criminal activities.

2.    As a result of my personal participation in this investigation, in addition to my conversations with other law enforcment agents and officers and my analysis of reports and other documents prepared or used in the course of this investigation, I am familiar with all aspects of this investigation.  I submit this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information that I have received from a variety of other sources, including other law enforcement officers and agents, public records and reports.  This affidavit does not recite all the information known to me as a result of this investigation, but is limited to that information necessary to establish probable cause for the seizure of the property listed in the following paragraph.

3.    This affidavit is made in support of an application for a seizure warrant pursuant to 18 U.S.C. §981(b) and 18 U.S.C. §982(b) for the following property:

> The contents of bank account number 8620008235, held in the name of MAQ Technologies, Inc./ Mohammed A.R. Quaraishi, at Charter One Bank, NA (the MAQ Charter One account);
>
> The contents of bank account number 8620398000, held in the name of Mohammed A.R. Quaraishi at Charter One Bank, (the Rasheed Charter One personal account).

4.    As discussed in more detail below, there is probable cause to believe the above-listed accounts were involved in and

were used to conduct and to facilitate money laundering activities, in violation of 18 U.S.C. §1956 and therefore, are subject to seizure and forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) and §982(a)(1).

5.    Specifically, as described below, the MAQ Charter One account and the Rasheed Charter One personal account were involved in and/or were used to facilitate financial transactions involving the proceeds of unlawful activities, namely encouraging or inducing an alien to come to, enter, or reside in the United States in violation of 8 U.S.C. §1324(a)(1)(A)(iv) and fraud and misuse of visas, permits and other documents in violation of 18 U.S.C. §1546.; These transactions were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(B)(i) and/or were conducted with the intent to promote the carrying on of the above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(A)(i).

6.    I further have probable cause to believe that the above-referenced accounts are subject to seizure as property which has is or has been used in the commission of a criminal offense and is evidence of a criminal offense within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

**_Factual Background_.**

7.    This case involves a visa fraud and fraudulent alien

employment scheme conducted by three brothers: Mohammed Abdul Aziz Quraishi a/k/a Quaraishi (Aziz), Mohammed Abdul Rasheed Quraishi (Rasheed) and Mohammed Abdul Qayium Quraishi (Qayium). The Quraishi brothers established two companies: Megasystems, Inc. and MAQ and established bank accounts in the names of these entities, including the MAQ Charter One account referenced above. In addition, Rasheed established the Rasheed Charter One personal account referenced above. In addition, as described below, the Quarashi brothers maintained a condominum that they used to house aliens involved in their fraudulent employment scheme.

8. The Quraishi brothers used the MAQ Charter One account and the Rasheed Charter One personal account to conduct the fraudulent visa scheme, whereby they would assist aliens in illegally remaining in the United States by fraudulently claiming that these aliens worked for MAQ and/or Megasystems. Specifically, as outlined below, money would be paid from the MAQ Charter One account to an alien, along with fraudulent pay stubs, falsely representing that the alien was employed by MAQ and/or Megasystems. After having received the "salary" payments from the MAQ Charter One account, the alien would repay the purported salary payments and an additional fee determined by Rasheed. These payments by the alien would be deposited in the Rasheed Charter One Personal account. Subsequently, Rasheed would transfer money from the Rasheed Charter One personal account back to the MAQ Charter One

-4-

account.  This fraudulent employment scheme provided the alien with false documentation, allowing him to obtain visas and reside illegally in the United States.

### *Statutory and Regulatory Background: United States H-1B Visa Program*

9.  The Immigration and Nationality Act ("INA") allows employers to sponsor the admission of an alien into the United States to perform services in a specialty occupation.  Under 8 U.S.C. §1153(b)(3)(A), the H-1B visa program, an alien seeking to come to the United States to work may obtain a non-immigrant visa in order to perform skilled labor in the United States.  The visa is valid for three years, with the option of an additional three-year extension.  An alien already lawfully admitted in the United States pursuant to an H-1B visa may apply for an extension for one year if he or she changes employers.  Such visas may not be granted, however, unless the Secretary of Labor certifies that the employer has a valid employment opportunity that he or she is attempting to fill ("the Labor Certification.")

10.  Pursuant to 20 C.F.R. §656.21, the Labor Certification may be obtained by filing a Department of Labor ("DOL") Labor Certification Application for alien employment certification, officially known as a form ETA 9035.  The application must be completed and signed by the prospective employer.  In the application, the employer attests that the employer has a specific

job to fill, describing the nature, location, wages, and requirements of the job.

11. Once DOL approves the application and issues a Labor Certification, the approved application is returned to the employer, who then files Form I-129, a non-immigrant visa application, with the Department of Homeland Security Bureau of Citizenship and Immigration Services.  Signed under the pains and penalties of perjury, the employer identifies the particular alien that the employer wants to hire to fill the job identified in the Labor Certification, as well as the nature and requirements of the job and wages to be paid.  The DOL certification is attached to Form I-129.  If approved, ICE issues Form I-797, Notice of Action, to the State Department indicating its concurrence with DOL.

12.  If the alien resides outside the United States, he/she is required to file Department of State Form-156 with the American Embassy or Consulate.  A subsequent in-person interview is conducted to determine whether the individual is qualified for the prospective job.  If she or he is qualified, the Department of State approves and issues a visa to permit the alien to come to the United States and accept the job identified in the Labor Certification.  If the alien is already lawfully in the country pursuant to an H-1B visa and is changing jobs, then the application is sent to the Department of State for approval without an in-person interview.

13.  The INA requires each sponsoring employer to be liable and responsible for the nonimmigrant authorized work based upon an H-1B visa.  Each H-1B applicant is required to maintain an active employment status with the petitioning company, or to obtain the approval of the Department of Labor and the Bureau of Citizenship and Immigration Services to change jobs.  An alien-employee who fails to maintain that employment status falls out of status and is subject to removal proceedings.  In addition, the sponsor company is responsible for the continued employment and salary of the sponsored alien.  If the alien has a change of status (by leaving the job) or changes occur in his/her employment, the sponsoring employer is required to notify DHS.

## *Overview of Megasystems Inc., MAQ Technologies and their Officers*

14.  Megasystems, Inc. (hereafter "Megasystems") is a Massachusetts-based corporation that was established in November 1997.  Megasystems advertises itself as a "specialty services firm providing complete software solutions to its clients" whose goal is to be "universally recognized as providing technical specialty services."  The Chief Executive Officer is listed as Abdul Aziz Quraishi.

15.  A corporate entity that is related to Megasystems is MAQ Technologies, Inc. (hereafter "MAQ Technologies"), previously headquartered at 504 Sherman Street, Canton, Massachusetts and

-7-

currently located at 953 N. Plum Grove, Schaumburg, Illinois. Both
Megasystems and MAQ Technologies claim to have an office at 953 N.
Plum Grove Road, Schaumburg, Illinois. The President of MAQ
Technologies is Mohammed Quraishi,[1] also known as Rasheed Quraishi
and Mohammed AR Quraishi. MAQ Technologies describes itself as a
"professional services firm that delivers IT Solutions through
consulting, outsourcing and strategic staffing." In addition to
claiming the same Illinois office and to provide the same services,
both Megasystems and MAQ Technologies share an office location and
phone number, and the officers of both companies appear on the
other's payroll statement and both have provided almost identical
employment letters in the H-1B visa applications submitted to the
United States.

### *The H-1B Application of CI-1*

16. In June 2004, law enforcement agents interviewed a
Cooperating Individual ("CI-1"). In the interview, CI-1, who is an
alien, said that he/she paid a conduit a large sum of money to
facilitate his/her fraudulent admission to the United States
pursuant to a H-1B visa. In summary, CI-1 said that MAQ

---

[1] On December 17, 1998, the Anti-Fraud Unit, Consulate General
of the United States, concluded that Mohammed Quraishi's own H-1B
visa application, sponsored by Megasystems, had been obtained
through fraud. The Immigration and Naturalization Service
subsequently revoked Quraishi's visa on August 3, 1999, but
Quraishi is believed to still be in the country and actively
involved in the operations of both Megasystems and MAQ
Technologies.

Technologies falsely represented to the United States that the company would employ CI-1. Based on this false representation, an H-1B visa was issued to CI-1. He/she entered the United States with this H-1B visa. However, CI-1 has never been employed by MAQ Technologies.

17. On November 27, 2000, MAQ Technologies electronically filed an ETA 9035 on behalf of CI-1. The Labor Conditional Application was for a H-1B specialty occupation computer programmer position for a salary of $40,000.00 to $45,000.00. The application was signed by David J. Francis, Vice President of Human Resources, MAQ Technologies, Canton, Massachusetts. The application was approved by the Department of Labor on December 1, 2000.

18. CI-1's immigration visa petition file includes supporting documentation and letters attesting to CI-1's experience, submitted by the president of MAQ Technologies, President Rasheed Quraishi, and dated February 28, 2000. The petition states that CI-1 would be employed as a computer programmer /analyst and would earn a salary of $45,000 a year. The petition was signed by the Vice President for Human Resources David J. Francis, and dated November 15, 2000. On March 12, 2001 INS approved the I-129 petition for a visa based upon documentation submitted by representatives at MAQ Technologies, including the DOL ETA 9035 certification. The visa was valid through January 15, 2004.

19.   On May 14, 2001, the Department of State issued CI-1 a United States H-1B Non-immigrant Visa, FOIL Number 43555306.   The visa was issued at Chennai, India and was valid until January 15, 2004.   The visa contains petition number 05551007 and reflects MAQ Technologies as the sponsoring company.   DHS indices confirm that the visa was used by CI-1 to enter the United Sates on or about June 10, 2001 at or near New York.

20.   When CI-1 arrived in the United States on or about June 10, 2001, he/she was informed by Rasheed Quraishi that there was no computer job available for CI-1 at MAQ/Megasystems.   According to CI-1, Rasheed informed CI-1 that MAQ/Megasystemes had a condominium available in Canton (the Walnut Street Condo) where CI-1 could stay and pay rent to Aziz Quraishi.   Rasheed instructed CI-1 to stay in the Walnut Street Condo and try to find work by himself/herself. Except for a short visit to Virginia to visit friends sometime during 2001 or 2002, CI-1 lived in the Walnut Street Condo from July 2001 until October 8, 2004.

### *The fraudulent employment scheme using the subject accounts*

21.   Using the subject accounts, Rasheed engaged CI-1 in a fraudulent employment pay stub/pay back scheme.   In July 2004, CI-1 provided law enforcement officers with several fraudulent pay stubs reflecting that he/she worked for MAQ Technologies in Schaumburg, Illinois as a computer programmer from June 30, 2003 to December 4, 2003.   In addition, a review of DOL indices indicate that MAQ

Technologies submitted information indicating that CI-1 has been employed at MAQ Technologies in Massachusetts beginning in 2003. MAQ reported that CI-1 was paid $9000 in the second quarter of 2003; $9000 in the third quarter; $6000 in the fourth quarter; and $9750 in the first quarter of 2004. Despite the information reflected on the fraudulent pay stubs and in the reports submitted by MAQ to the government, CI-1 has stated that he/she never worked for MAQ technologies or Megasystems and had never lived or worked in Illinois.  In fact, during the time period reflected by the pay stubs, CI-1 had been living in the Walnut Street Condo and had worked as a clerk at a convenience store in Massachusetts.

22.  CI-1 informed law enforcement that the false employment stubs and checks were mailed to him/her from Rasheed who lived in Illinois and that Rasheed provided CI-1 with a series of fraudulent employment pay stubs and checks drawn on the MAQ account, giving the appearance that CI-1 was a full-time employee of MAQ/Megasystems.  Records for the MAQ Charter One Account reflect that this account was opened on May 7, 2003 by Rasheed.

23.  The MAQ Charter One account was used to make fraudulent payments to CI-1, a purported employee, in order to make it appear that CI-1 was employed by MAQ/Megasystems, allowing CI-1 to maintain his/her visa status and reside in the United States illegally, without being detected by law enforcement.  From on or about June 30, 2003, through December 4, 2003, a total of seven

-11-

company checks from MAQ Technologies were written on the MAQ
Charter One bank account, signed by Rasheed and made payable to CI-
1. The total of these seven checks was $15,875.34. These checks,
purportedly for CI-1's employment by MAQ, have the letterhead of
MAQ Technologies, indicating its address is 953 North Plum Grove D.
Schaumburg, Illinois 60173.

24. Specifically, the MAQ Charter One account statements
reflect that the following checks, all made out to CI-1, were paid
from the MAQ Charter One account on the following dates: check 313
for $2,255.57 on August 4, 2003; check 329 for $2,271.99 on
September 10, 2003; check 350 for $2,271.99 on October 16, 2003;
check 378 for $2,271.99 on November 10, 2003; check 408 for
$2,271.99 on December 15, 2003; check 489 for $2,271.99 on January
14, 2004 and check 447 for $2,259.82 on January 7, 2004.

25. After having received the purported employment payments
from the MAQ Charter One account, CI-1 was instructed to deposit
the checks drawn on the MAQ Charter One account into CI-1's own
personal account, and then to write checks on CI-1's personal
account made out to Rasheed. These checks were then deposited into
the Rasheed Charter One personal account. In addition to repaying
the purported salary, CI-1 was also required to pay an additional
fee to Rasheed, which was also deposited into the Rasheed Charter
One personal account. The total amount of the checks, which were

paid by CI-1 to Rasheed and deposited into the Rasheed Charter One personal account was $20,496.65.

26. CI-1 was instructed to make out these checks to the name of "Mohammed A. Quaraishi." CI-1 has provided an electronic message dated July 13, 2003, sent to CI-1 by Rasheed Quraishi containing this instruction. The e-mail was entitled "info" and the text stated, in its entirety:

> Check Name: Mohammed A Quaraishi,
>
> Thanks

27. The signature block of the e-mail read:

> Rasheed Quaraishi
> MAQ Technologies Inc.
>
> 953 N. Plum Grove RD, Sutie #D
> Schaumburg, IL 60173
> Ph: 847-619-5009
> Fax: 847-619-5166
> Cell: 781-367-0628
> Email : rasheed@maqtechnologies.com
> Website:www.maqtechnolgies.com

28. In addition, Rasheed instructed CI-1 to break the payments up into separate checks, which were then deposited into the Rasheed Charter One personal account. Based on my training an experience, money launderers often divide deposits into a series of separate checks to avoid detection by law enforcement and to conceal or disguise the source or nature of the funds.

29. Bank records indicate that from July 23, 2003 through December 29, 2003, seventeen (17) checks, totalling $20,496.65,

written by CI-1 and made out to "Mohammed A Quraishi" were deposited into the Rasheed Charter One personal account. All the personal checks that had legible endorsements were signed by Rasheed Quaraishi. The name and signature of Rasheed Quraishi appears on the Bank Deposit Agreement and appears to be similiar to the endorsements on the checks.

30. Rasheed then engaged in a series of monetary transactions, transferring funds from the Rasheed Charter One personal account to the MAQ Technologies Charter One account. During the period June 20, 2003 to May 14, 2004, $155,718.00 was transferred from the Rasheed Charter One personal account to the MAQ Technologies Charter One Account.

### *Extension of CI-1's H-1B Visa*

31. CI-1 informed law enforcement that, beginning in December 2003 he/she discussed applying for a fraudulent extension of his/her H-1B visa with Qaiyum Quraishi. Qaiyum indicated that he would assist CI-1 in obtaining a fraudulent visa extension for a fee of $3000. CI-1 provided law enforcement with a $3000 negotiated check from CI-1's account. This check, numbered 210 and dated January 15, 2004, is made payable to MAQ Technologies, Inc. The back of the check reflects the signature of "Qaiyum Quraishi" and indicates that it was deposited at Fleet Bank 9418300677, held in the name of MAQ Technologies Inc./Abdul Aziz Quaraishi and Ather Haq at Fleet Bank (the MAQ Fleet Account).

-14-

32.  In December 2003, MAQ Technologies submitted Form I-129 for the extension of CI-1's visa, incorporating the fraudulent pay stubs.  The paperwork was signed by Samu Thomas, Director of HR and indicated that CI-1 was presently a computer programmer at MAQ and that the company wanted to continue to employ him/her.  The extension was approved on December 30, 2003.

### *The Walnut Street Condo*

33.  In addition, the Quraishi brothers maintained a condominum where they encouraged aliens who were in the United States unlawfully and were purportedly working for MAQ/Megasystems to reside.  This condominium was located at 80 Walnut Street, Unit 401, Canton Massachusetts 02021 ("the Walnut Street Condo").

34.  On June 25, 2004, as part of this investigation, a federal search warrant was executed at Megasystems.  During the course of the search, federal agents discovered a condominium purchase and sales agreement dated August 29, 2000 for the purchase of 80 Walnut Street, Unit 401, Canton, Massachusetts.  This document indicated that the purchaser of the property was Megasystems, Inc.  The purchase and sale agreement was signed by Rasheed Quraishi.

35.  The deed for the Walnut Street Condo, dated September 25, 2000, indicated that the purchaser of the Walnut Street Condo was Aziz Quraishi for a price of $115,000.  A mortgage of $92,000 was held by Fleet Mortgage Corporation, who apparently at some point

transferred the mortgage to Washington Mutual Bank. The mortgage was discharged on February 4, 2003. The recipient of the discharge was Aziz Quraishi.

36. In April 2003, the Canton police received a report of suspicious activity occurring at the Walnut Street Condo. Neighbors reported frequently observing males described as "Middle Eastern" arriving at and leaving the Walnut Street Condo, often carrying laptop computers and attache cases. On April 23, 2003, at approximately 6:00 am, a team consisting of federal and local law enforcement agents arrived at the Walnut Street Condo. A total of eight males were found in the two-bedroom apartment, many of whom were sleeping on mattresses on the floor. All the occupants were questioned for immigration status purposes and all were found to have H-1B visas which were sponsored by Megasystems. The occupants stated that Qaiyum Quraishi was the owner of the Walnut Street Condo and was also the owner of Megasystems. The occupants stated that they each paid approximately $200/month rent for living in the Walnut Street Condo, and that the rent was deducted from their $45,000 a year salaries.

37. Also on June 25, 2004, Joint Terrorism Task Force Special Agent Galen Nace encountered CI-1 at the Walnut Street Condo. CI-1 informed Nace that he/she was not working for MAQ Technologies and that he/she was working at a convenience store. CI-1 knew that the FBI previously "raided" the Walnut Street Condo before and stated

that he/she was not home at the time of the raid. Later, CI-1 stated that he/she had resided in the Walnut Street condo since 2001 and that Aziz Quraishi was responsible for collecting rent from the foreign nationals living in the Walnut Street condo. CI-1 further stated that, at any one time, as many as 15 foreign nationals had lived in the Walnut Street Condo.

38. During the time that CI-1 was involved in the fraudulent employment scheme described above, CI-1 was required to pay $240 monthly as rent for his residence at the Walnut Street Condo. CI-1 made these rent payments to Aziz Quraishi, who was the record owner of the Walnut Street Condo and the CEO of Megasystems. CI-1 has provided three cancelled checks, two of which were made payable to Aziz Quraishi and one to Abdul Aziz (which is an alias of Aziz Quraishi). Each of these check was in amount of $240. All of the checks were negotiated. Two of the checks are endorsed by Aziz Quraishi, while the other check is endorsed by Qaiyim Quraishi.

### *Aziz's Statements to Law Enforcement Agents on June 25, 2004*

39. On June 25, 2004, federal agents executed a search warrant issued in District of Massachusetts (M.J. No. 04-1803-CBS) at Megasystems Inc. 500 Chapman Street, Canton, Massachusetts. During the execution of this search warrant, Aziz Quraishi was interviewed by ICE Special Agent Deasy and FBI Special Agent Robert Doherty. After being advised of his rights and verbally waiving those rights Aziz stated that he was the CEO of Megasystems. Aziz

-17-

indicated that his brother, Rasheed, was the vice-president of the company and his brother, Qaiyum was the director of human resources. Aziz said that Rasheed currently worked in Illinos for MAQ Technologies. Aziz stated that, originally, MAQ had been part of Megasystems, but asserted that the two were now independent companies. Aziz admitted that the Quraishi brothers had invented a Megasystems corporate officer named "David J. Francis" and had used this fraudulent name on visa applications. Aziz said that the name "David J. Francis" had been chosen because it sounded "American," enabling the visas to be approved more quickly by the government. Aziz further stated that "David J. Francis" had never been an employee of MAQ/Megasystems. and that it was his brother Qaiyum's idea to make up the name. Aziz estimated that the company had filed between 25 - 50 petitions utilizing the false name of David J. Francis.

40. Furthermore, Aziz admitted that MAQ/Megasystems had assisted between four to five aliens with applying for H-1B visas, although the aliens never worked for MAQ/Megasystems. Aziz stated that they informed the aliens to find some type of work in the computer field. Aziz asserted that he had not charged the aliens a fee, and that this assistance was provided as a courtesy so that the aliens could better themselves in the United States. Aziz admitted that, on some occasions, aliens were provided room and board at the Walnut Street Condo. Aziz stated that the company

owned the Walnut Street Condo and was responsible for paying all the expenses for the aliens, and that the aliens had paid nothing. Aziz further stated that the company paid all the rent, food and lodging for all the aliens that resided at the Walnut Street Condo. Aziz admitted that the Walnut Street Condo was set up solely as a place for workers to stay if they had no place to go. Aziz estimated that approximately 50 - 70 aliens with H-1B visas had stayed at the Walnut Street Condo over time. Aziz stated that he personally had never lived in the Walnut Street Condo.

41. Aziz also admitted to Megasystems/MAQ's participation in the fraudulent employment scheme described above. Aziz indicated that, if aliens wanted to maintain lawful status in the United States, they were sometimes required by INS to show that they had pay stubs from Megasystems. Aziz stated that he would provide certain aliens who did not work for Megasystems with a number of pay stubs, each indicating that they had earned approximately $3,500 from Megasystems. Aziz stated that the figure was based on the $45,000 annual salary that Megasystems had falsely indicated to the government that the alien would earn. Aziz stated that Megasystems would provide up to six months of pay stubs for each alien. According to Aziz, the aliens would then pay back to Megasystems the money represented by the pay stubs, plus an additional amount purportedly representing taxes. Aziz claimed that this additional amount was approximately 10 - 20 percent of

the total amount paid. Aziz estimated that Megasystems had sponsored approximately 300 aliens, and that approximately 180-190 of those aliens were no longer working for Megasystems. Aziz admitted that he had not reported the change of employment for these aliens to the government. In addition, Aziz estimated that approximately 10-15 of the aliens sponsored by Megasystems had, in fact, never worked for Megasystems.

42. When asked for specific names of aliens sponsored for H-1B visas by Megasystems, but who, in fact, had never worked at Megasystems, Aziz provided several names. Aziz cited employee 127, Sanjay Bahugna, who was listed on the Megasystems payroll as having last been paid on October 31, 2003. Aziz stated that Sanjay came to the United States in 2003, stayed at the Walnut Street Condo for two weeks, but had never worked for Megasystems.

43. In addition, Aziz admitted that he had assisted 10 - 20 aliens with applying for extensions for their H-1B visas. Aziz admitted that these people were not working for Megasystems at the time they he assisted them in seeking their extensions.

### Recorded Conversations with Aziz and Qaiyum Quraishi

44. From September 10 through October 4, 2004, CI-1 met and recorded conversations with Aziz and Qaiyum Quraishi under the direction of law enforcement. The meetings and recordings took place at Megasystems, 500 Chapman Street, Canton Massachusetts and the Quraishi home located 38 Kevin Clancy Way, Stoughton,

Massachusetts.  At the meetings, Aziz and Qaiyum discussed visa fraud, money payments, fraudulent documents, and the current problems with the police relating to aliens staying at the Walnut Street condo.  Several of the meetings focused on Aziz and Quiyum arranging the continued harboring and smuggling of CI-1 from the United States to India and back into the United States.  CI-1 has informed law enforcement that because of the ongoing investigation the Quraishi brothers wanted to clear out the Walnut Street condo of all foreign nationals by the first week of October.  According to CI-1, the Quraishi brothers indicated that, because of the ongoing problems with law enforcement, they were considering selling the Walnut Street condo in the near future.

45.  All of the aforementioned meetings between CI-1, Aziz, and Qaiyum were monitored and consensually recorded by law enforcement.  However, due to equipment failure the first meeting on September 10, 2004 was not successfully recorded.  Because the recordings were in a foreign language and are currently being interpreted, CI-1 was debriefed immediately after each meeting.

46.  Prior to these conversations, in late August 2004, CI-1 reported that the Quraishi brothers were concerned about the Walnut Street Condo due to the investigation.  Aziz  informed CI-1 that he/she would have to leave the Walnut Street Condo, find a new place to live and possibly leave the United States.  On September 14, 2004, Qaiyum unexpectedly approached CI-1 and informed him/her

that he/she would have to go back to India.  Qaiyum said that it
would be best to leave the country because of the investigation and
that it would be a good idea for CI-1 to leave the United States
for a couple of months, making it appear that CI-1 was taking an
extended vacation in India.  Qaiyum instructed CI-1 that when
he/she returned from India, he/she should go directly to Chicago
because that is where he/she was purportedly employed by MAQ
Technologies.  Qaiyum further assured CI-1 that if the police
inquired as to his/her location, Qaiyum would say that CI-1 was on
vacation in India.  On September 24, 2004, in a recorded
conversation, Qaiyum told CI-1 that Qaiyum would purchase an
airline ticket for CI-1 with the $2000 that CI-1 had previously
given Qaiyum for a green card.  Qaiyum, however, required CI-1 to
write a blank check for the ticket so it would appear that the CI-1
had paid for the ticket with money from CI-1's checking account.
When CI-1 told Qaiyum that there was not enough money in his/her
checking account to cover the check, Qaiyum said that he would
deposit money into CI-1's account to cover the check.

47.  On October 4, 2004, a cash payment of $2000 was deposited
into CI-1's checking account.

### *Conclusion*

48.  In conclusion, based on the information provided in this
affidavit, there is probable cause to believe the the above-listed
accounts -- the MAQ Charter One account and the Rasheed Charter One

personal account -- were involved in and were used to conduct and to facilitate money laundering activities, in violation of 18 U.S.C. §1956 and therefore, are subject to seizure and forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) and (b) and 18 U.S.C. §982(a) and (b), and, in addition, have been used in the commission of a criminal offense and are evidence of the criminal offense, within the meaning of Federal Rule of Criminal Procedure 41.


_____

Richard M. Deasy
Special Agent, ICE


Subscribed and sworn to before me this  day of November, 2004.


_____
Charles B. Swartwood III
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CASE NO. *04 -10345-NMG* |
| v. | ) | |
| | ) | VIOLATIONS: |
| | ) | |
| MOHAMMED ABDUL RASHEED QURAISHI, | ) | 8 U.S.C. §1324 -- |
| | ) | Encouraging and Inducing |
| MOHAMMED ABDUL QAYIUM QURAISHI and | ) | Aliens to Come To, Enter |
| | ) | and Reside in the United |
| MOHAMMED ABDUL AZIZ QURAISHI | ) | States in Violation of Law |
| | ) | |
| | ) | 18 U.S.C. §1512(b)(3) -- |
| | ) | Witness Tampering |
| | ) | |
| | ) | 18 U.S.C. §2 -- |
| | ) | Aiding and Abetting |

## INDICTMENT

**COUNT ONE:** (8 U.S.C. § 1324(a)(1)(A)(iv) – Encouraging and Inducing Aliens to Come to, Enter and Reside in the United States in Violation of Law)

The Grand Jury charges that:

From in or about July, 2003 through in or about December, 2003, in the District of

Massachusetts, and elsewhere

### MOHAMMED ABDUL RASHEED QURAISHI,

the defendant herein, did encourage and induce an alien, to come to, enter, and reside in the

United States, knowing and in reckless disregard of the fact that such coming to, entry, and

residence was or would be in violation of law.

All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and Title 18,

United States Code, Section 2.



**<u>COUNT TWO</u>:   (8 U.S.C. § 1324(a)(1)(A)(iv)  – Encouraging and Inducing Aliens to Come to, Enter and Reside in the United States in Violation of Law)**

The Grand Jury further charges that:

From in or about June, 2002 through in or about October, 2004, in the District of

Massachusetts, and elsewhere

**MOHAMMED ABDUL AZIZ QURAISHI,**

the defendant herein, did encourage and induce an alien, to come to, enter, and reside in the

United States, knowing and in reckless disregard of the fact that such coming to, entry, and

residence was or would be in violation of law.

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and Title 18,

United States Code, Section 2.

**COUNT THREE:**   (8 U.S.C. § 1324(a)(1)(A)(iv)  – Encouraging and Inducing Aliens to Come to, Enter and Reside in the United States in Violation of Law and for Commercial Advantage)

The Grand Jury further charges that:

From in or about December, 2003 through in or about October, 2004 in the District of

Massachusetts, and elsewhere

## MOHAMMED ABDUL QAIYUM QURAISHI,

the defendant herein, did, for the purpose of commercial advantage and private financial gain,

encourage and induce an alien, to come to, enter, and reside in the United States, knowing and in

reckless disregard of the fact that such coming to, entry, and residence was or would be in

violation of law.

All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv), (a)(1)(B)(i) and

Title 18 United States Code, Section 2.

**COUNT FOUR:**     (18 U.S.C. § 1512(b)(3) – Witness Tampering)

The Grand Jury further charges that:

From in or about June, 2004 through in or about October, 2004, in the District of

Massachusetts,

### MOHAMMED ABDUL AZIZ QURAISHI,

the defendant herein, did attempt to corruptly persuade another person, with intent to hinder,

delay, and prevent communication to a law enforcement officer of the United States of

information related to the commission or possible commission of a federal offense.

All in violation of Title 18, United States Code, Section 1512(b)(3).

**COUNT FIVE:**    **(18 U.S.C. § 1512(b)(3) – Witness Tampering)**

The Grand Jury further charges that:

From in or about September, 2004 through in or about October, 2004, in the District of

Massachusetts,

**MOHAMMED ABDUL QAYIUM QURAISHI,**

the defendant herein, did attempt to corruptly persuade another person, with intent to hinder,

delay, and prevent communication to a law enforcement officer of the United States of

information related to the commission or possible commission of a federal offense.

All in violation of Title 18, United States Code, Section 1512(b)(3).



**FORFEITURE ALLEGATION**: 18 U.S.C. 982(a)(6)-- Criminal Forfeiture

The Grand Jury further alleges that:

As a result of committing one or more of the offenses alleged in Counts One, Two and

Three of this Indictment, charging encouraging and inducing aliens to come to, enter, and reside in

the United States, knowing or in reckless disregard of the fact that such coming to, entry, and

residence was or would be in violation of law, in violation of 8 U.S.C. §1324(a)(1)(A)(iv):

**MOHAMMED ABDUL AZIZ QURAISHI** and

**MOHAMMED ABDUL RASHEED QURAISHI**,

defendants herein, upon conviction, shall forfeit to the United States, pursuant to 18 U.S.C.

§982(a)(6)(A), any conveyance, including any vessel, vehicle, or aircraft used in the commission

of the offense; and any property real or personal that constitutes, or is derived from or is traceable

to the proceeds obtained directly or indirectly from the commission of the offense; or that is used

to facilitate, or is intended to be used to facilitate the commission of the offense.

1. Such property includes, but is not limited to, the following:

(a)  The real property located at 80 Walnut Street, Unit 401, Canton Massachusetts 02021,

more specifically described in the deed recorded on September 25, 2000, in the Norfolk County

registry of deeds, book 14423, page 104;

2. If any of the above-described forfeitable property, as a result of any act or omission of

the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or



(e) has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. §853(p), as incorporated by 18 U.S.C.

§982(b), to seek forfeiture of any other property of the defendants up to the value of the above

forfeitable property,

Such property includes, but is not limited to:

the real property located at 38 Kevin Clancy Way, Stoughton, Massachusetts, more

fully described in the deed recorded at Book 15017, Page 403 of the Norfolk

County Registry of Deeds, in the name of Abdul A. Quiraishi,

All in accordance with Title 18, United States Code, Section U.S.C. 982(a)(6) and Rule

32.2(a), Federal Rules of Criminal Procedure.

**A TRUE BILL**

FOREPERSON OF GRAND JURY

KIMBERLY P. WEST
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS, Boston, November 18, 2004 @ 2:16 PM

Returned into the District Court by the Grand Jurors and filed.

Deputy Clerk

JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

**Place of Offense:**                 **Category No.** II          **Investigating Agency** ICE

**City** Canton                       **Related Case Information:**

**County** Norfolk                    Superseding Ind./ Inf. _____  Case No. _____
                                      Same Defendant _____  New Defendant _____
                                      Magistrate Judge Case Number _____
                                      Search Warrant Case Number  04-1803-CBS
                                      R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  Mohammed Abdul Aziz Quraishi          Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address  38 Kevin Clancy Way, Stoughton, MA

Birth date: 1965      SS#: ---- -- 0877   Sex: M   Race: _____   Nationality: Indian

**Defense Counsel if known:**  Bill Brown              **Address:** 31 Milk Street
                                                        Boston, MA 02109
**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  Kim West                    **Bar Number if applicable** _____

**Interpreter:** ☐ Yes  ☒ No          **List language and/or dialect:** _____

**Matter to be SEALED:** ☒ Yes  ☐ No

        ☒ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____  in  _____.
☐ **Already in State Custody** _____  ☐ **Serving Sentence**  ☐ **Awaiting Trial**
☐ **On Pretrial Release:**  Ordered by _____  on _____

**Charging Document:**   ☐ **Complaint**   ☐ **Information**   ☒ **Indictment**

**Total # of Counts:**   ☐ **Petty** _____  ☐ **Misdemeanor** _____  ☒ **Felony** 2

**Continue on Page 2 for Entry of U.S.C. Citations**

☒   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
    accurately set forth above.

**Date:**  11/18/04          **Signature of AUSA:** _____

✎JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number (To be filled in by deputy** _____

**Name of Defendant**    Mohammed Abdul Aziz Quaraishi_____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 8 U.S.C. § 1324(a)(1)(A)(iv) | encourag. inducing alien to reside in U.S. | 2 |
| Set 2 | 18 U.S.C. § 1512(b)(3) | witnes tampering | 4 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

Place of Offense:                        Category No. __II__          Investigating Agency __ICE__

City __Canton__                          Related Case Information:

County __Norfolk__                       Superseding Ind./ Inf. _____    Case No. _____
                                         Same Defendant _____    New Defendant _____
                                         Magistrate Judge Case Number _____
                                         Search Warrant Case Number __04-1803-CBS__
                                         R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __Mohammed Abdul Qayium Quraishi__          Juvenile    ☐ Yes    ☒ No

Alias Name __a/k/a Mohammed AQ Quraishi, a/k/a Qaiyum Quraishi, a/k/a Mohammed Q. Quraishi__

Address __38 Kevin Clancy Way, Stoughton, MA__

Birth date: __–/–/66__    SS#: __----- 8009__    Sex: __M__    Race: _____    Nationality: __Indian__

Defense Counsel if known: __Bill Brown__          Address: __31 Milk Street__
                                                            __Boston, MA 02109__
Bar Number:          _____

**U.S. Attorney Information:**

AUSA __Kim West__                        Bar Number if applicable _____

Interpreter:    ☐ Yes    ☒ No          List language and/or dialect: _____

Matter to be SEALED:    ☒ Yes    ☐ No

        ☒ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

Arrest Date:          _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:    Ordered by _____    on _____

Charging Document:    ☐ Complaint    ☐ Information    ☒ Indictment

Total # of Counts:    ☐ Petty _____    ☐ Misdemeanor _____    ☒ Felony __2__

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: __11/8/04__    Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number (To be filled in by deputy** _____

**Name of Defendant**    Mohammed Abdul Qayium Quaraishi _____

### U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  8 U.S.C. § 1324(a)(1)(A)(iv) | encourag. inducing alien to reside in U.S. | 3 |
| Set 2  18 U.S.C. § 1512(b)(3) | witness tampering | 5 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____

_____

JS 45  (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                        **U.S. District Court - District of Massachusetts**

**Place of Offense:**                  **Category No.**  II_____       **Investigating Agency**  ICE_____

**City**   Canton_____       **Related Case Information:**

**County**   Norfolk_____      Superseding Ind./ Inf. _____  Case No. _____
                                       Same Defendant _____  New Defendant _____
                                       Magistrate Judge Case Number _____
                                       Search Warrant Case Number   04-1803-CBS_____
                                       R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   Mohammed Abdul Rasheed Quaraishi_____     Juvenile    ☐ Yes   ☒ No

Alias Name   a/k/a Rasheed Quaraishi, a/k/a Mohammed AR Quaraishi,_____

Address   unknown_____

Birth date: 1971_____   SS#: — – 3173_____  Sex: M__  Race: _____   Nationality: Indian_____

**Defense Counsel if known:**   Bill Brown_____   Address: **31 Milk Street**
                                                                  **Boston, MA 02109**
**Bar Number:**   _____

**U.S. Attorney Information:**

**AUSA**   Kim West_____            **Bar Number if applicable**   _____

**Interpreter:**   ☐ Yes   ☒ No        **List language and/or dialect:**   _____

**Matter to be SEALED:**   ☒ Yes   ☐ No

      ☒ Warrant Requested        ☐ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____  ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony   1

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

**Date:**   11/18/0 4        **Signature of AUSA:**

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy** _____

**Name of Defendant**    Mohammed Abdul Rasheed Quaraishi _____

<div align="center">

U.S.C. Citations

</div>

|  | **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
|---|---|---|---|
| Set 1 | 8 U.S.C. § 1324(a)(1)(A)(iv) | encourag. inducing alien to reside in U.S. | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>$103,342.22 IN U.S. CURRENCY, and,<br>$4,468.18 IN U.S. CURRENCY,<br>Defendants. | )<br>)<br>)<br>) Civil Action No.<br>)<br>)<br>)<br>) |

05 CV 10515 REK

RECEIPT #
AMOUNT _____ N/A
SUMMONS ISSUED ___ 3
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK ___ M.V.
DATE ___ 3/1-/05

MAGISTRATE JUDGE _____

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J.
Sullivan, United States Attorney for the District of Massachusetts,
in a civil action of forfeiture pursuant to Title 18, United States
Code, Sections 981(a)(1)(A), alleges that:

1.  This Court has jurisdiction in this matter pursuant to 28
U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant to
28 U.S.C. § 1395.

2.  The in rem defendant properties are now, and, during the
pendency of this action, will be within the jurisdiction of this
Court.

3.  The defendant properties are identified as:

*   $103,342.22 in U.S. Currency, representing the contents
    of bank account number 8620008235, held in the name of
    MAQ Technologies, Inc./ Mohammed A.R. Quaraishi, at
    Charter One Bank, NA (the MAQ Charter One account); and,

*   $4,468.18 in U.S. Currency, representing the contents of
    bank account number 8620398000, held in the name of
    Mohammed A.R. Quaraishi at Charter One Bank, (the Rasheed
    Charter One personal account)

(collectively referred to as the "Defendant Accounts").

4.     As detailed in the Affidavit of United States Bureau of Immigration and Customs Enforcement Supervisory Special Agent Richard M. Deasy, attached hereto as Exhibit A, and incorporated herein by reference, the United States has probable cause to believe that the Defendant Accounts were involved in and were used to conduct and to facilitate money laundering activities, in violation of 18 U.S.C. §1956. Specifically, as described below, the MAQ Charter One account and the Rasheed Charter One personal account were involved in and/or were used to facilitate financial transactions involving the proceeds of unlawful activities, namely encouraging or inducing an alien to come to, enter, or reside in the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(iv), and fraud and misuse of visas, permits, and other documents, in violation of 18 U.S.C. §1546. These transactions were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(B)(i), and/or were conducted with the intent to promote the carrying on of the above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(A)(i).

5.     The Defendant Accounts, therefore, are subject to seizure and forfeiture tc the United States of America, pursuant to 18 U.S.C. §981(a)(1)(A).

2

WHEREFORE, the United States of America prays:

1.    That a warrant and monition, in the form submitted
herewith, be issued to the United States Bureau of Customs and
Border Protection, commanding them to: (a) take custody of the
Defendant Accounts, and (b) give notice to all interested parties
to appear and show cause why the forfeiture should not be decreed;

2.    That judgment of forfeiture be decreed against the
Defendant Accounts;

3.    That thereafter, the Defendant Accounts shall be disposed
of according to law; and

4.    For costs and all other relief to which the United States
may be entitled.

                              Respectfully submitted,
                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:  _____
                              JENNIFER H. ZACKS
                              Assistant U.S. Attorney
                              1 Courthouse Way, Suite 9200
                              Boston, MA 02210
                              (617) 748-3100

Dated: 3/18/05

3

<u>VERIFICATION</u>

I, Richard M. Deasy, Supervisory Special Agent, United States Bureau of Immigration and Customs Enforcement, state that I have read the foregoing Verified Complaint for Forfeiture <u>In Rem</u> and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information and belief.

Richard M. Deasy,
Supervisory Special Agent
United States Bureau of Immigration
and Customs Enforcement

Dated: 3/18/2005

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                    Boston

Then personally appeared before me the above-named Richard M. Deasy, Supervisory Special Agent, United States Bureau of Immigration and Customs Enforcement, who acknowledged the foregoing to be true to the best of his knowledge, information, and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this _____8th_____ day of March, 2005.

Notary Public
My commission expires: 5/29/09

LISA J. TALBOT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 29, 2009

4

## AFFIDAVIT OF SPECIAL AGENT RICHARD M. DEASY

I, Richard M. Deasy, being duly sworn, hereby depose and state as follows:

1. I am a Supervisory Special Agent of the United States Bureau of Immigration and Customs Enforcement ("ICE") and have been employed as a Special Agent and Supervisory Special Agent for approximately thirteen years. For the past two years, I have been assigned to the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force ("JTTF") in Boston, Massachusetts. During my employment as a Special Agent with ICE, I have been involved in numerous investigations concerning alien smuggling and the unlawful procurement of immigration benefits by means of fraud. I have also conducted numerous investigations concerning the fraudulent procurement, sale, and distribution of United States identification documents to include passports, visas, and immigration documents. One of my responsibilities is the investigation of the fraudulent acquisition of United States visas in the context of alien smuggling and employment fraud. In addition, my responsibilities include the investigation and detection of money laundering activities related to criminal activities involving immigration, including the procurement of fraudulent documents, alien smuggling and immigration fraud. I have received training in the identification and tracing of illegal proceeds and I am familiar with the methods commonly used to launder proceeds of illicit activities and I have been involved in several money laundering

investigations involving the proceeds of immigration-related criminal activities.

2.   As a result of my personal participation in this investigation, in addition to my conversations with other law enforcement agents and officers and my analysis of reports and other documents prepared or used in the course of this investigation, I am familiar with all aspects of this investigation. I submit this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information that I have received from a variety of other sources, including other law enforcement officers and agents, public records and reports.

3.   I submit this affidavit in support of a Complaint for Forfeiture in Rem against the following property:

> a.   $103,342.22 in U.S. Currency, representing the contents of bank account number 8620008235, held in the name of MAQ Technologies, Inc./ Mohammed A.R. Quaraishi, at Charter One Bank, NA (the "MAQ Charter One account"); and,
>
> b.   $4,468.18 in U.S. Currency, representing the contents of bank account number 8620398000, held in the name of Mohammed A.R. Quaraishi at Charter One Bank, (the "Rasheed Charter One personal accountL"),

(collectively referred to as the "Defendant Accounts").

4.   As discussed in more detail below, I have probable cause to believe that the above-described Defendant Accounts were involved in and were used to conduct and to facilitate money laundering activities, in violation of 18 U.S.C. §1956 and

therefore, are subject to seizure and forfeiture to the United States, pursuant to 18 U.S.C. §981(a)(1)(A).

5. Specifically, as described below, the MAQ Charter One account and the Rasheed Charter One personal account were involved in and/or were used to facilitate financial transactions involving the proceeds of unlawful activities, namely encouraging or inducing an alien to come to, enter, or reside in the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(iv), and fraud and misuse of visas, permits, and other documents, in violation of 18 U.S.C. §1546. These transactions were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(B)(i), and/or were conducted with the intent to promote the carrying on of the above-listed unlawful activities, in violation of 18 U.S.C. §1956(a)(1)(A)(i).

### *Factual Background.*

6. This case involves a visa fraud and fraudulent alien employment scheme conducted by three brothers: Mohammed Abdul Aziz Quraishi a/k/a Quaraishi (Aziz), Mohammed Abdul Rasheed Quraishi (Rasheed) and Mohammed Abdul Qayium Quraishi (Qayium). The Quraishi brothers established two companies: Megasystems, Inc., and MAQ, and established bank accounts in the names of these entities, including the MAQ Charter One account referenced above.

-3-

In addition, Rasheed established the Rasheed Charter One personal account referenced above. Furthermore, as described below, the Quarashi brothers maintained a condominimum that they used to house aliens involved in their fraudulent employment scheme.

7. The Quraishi brothers used the MAQ Charter One account and the Rasheed Charter One personal account to conduct the fraudulent visa scheme, whereby they would assist aliens in illegally remaining in the United States by fraudulently claiming that these aliens worked for MAQ and/or Megasystems. Specifically, as outlined below, money would be paid from the MAQ Charter One account to an alien, along with fraudulent pay stubs, falsely representing that the alien was employed by MAQ and/or Megasystems. After having received the "salary" payments from the MAQ Charter One account, the alien would repay the purported salary payments and an additional fee determined by Rasheed. These payments by the alien would be deposited in the Rasheed Charter One Personal account. Subsequently, Rasheed would transfer money from the Rasheed Charter One personal account back to the MAQ Charter One account. This fraudulent employment scheme provided the alien with false documentation, allowing him to obtain visas and reside illegally in the United States.

## Statutory and Regulatory Background: United States H-1B Visa Program

8. The Immigration and Nationality Act ("INA") allows employers to sponsor the admission of an alien into the United

-4-

States to perform services in a specialty occupation. Under 8 U.S.C. §1153(b)(3)(A), the H-1B visa program, an alien seeking to come to the United States to work may obtain a non-immigrant visa in order to perform skilled labor in the United States. The visa is valid for three years, with the option of an additional three-year extension. An alien already lawfully admitted in the United States pursuant to an H-1B visa may apply for an extension for one year if he or she changes employers. Such visas may not be granted, however, unless the Secretary of Labor certifies that the employer has a valid employment opportunity that he or she is attempting to fill ("the Labor Certification.")

9. Pursuant to 20 C.F.R. §656.21, the Labor Certification may be obtained by filing a Department of Labor ("DOL") Labor Certification Application for alien employment certification, officially known as a form ETA 9035. The application must be completed and signed by the prospective employer. In the application, the employer attests that the employer has a specific job to fill, describing the nature, location, wages, and requirements of the job.

10. Once DOL approves the application and issues a Labor Certification, the approved application is returned to the employer, who then files Form I-129, a non-immigrant visa application, with the Department of Homeland Security Bureau of Citizenship and Immigration Services. Signed under the pains and

penalties of perjury, the employer identifies the particular alien that the employer wants to hire to fill the job identified in the Labor Certification, as well as the nature and requirements of the job and wages to be paid. The DOL certification is attached to Form I-129. If approved, ICE issues Form I-797, Notice of Action, to the State Department indicating its concurrence with DOL.

11. If the alien resides outside the United States, he/she is required to file Department of State Form-156 with the American Embassy or Consulate. A subsequent in-person interview is conducted to determine whether the individual is qualified for the prospective job. If she or he is qualified, the Department of State approves and issues a visa to permit the alien to come to the United States and accept the job identified in the Labor Certification. If the alien is already lawfully in the country pursuant to an H-1B visa and is changing jobs, then the application is sent to the Department of State for approval without an in-person interview.

12. The INA requires each sponsoring employer to be liable and responsible for the non-immigrant authorized work based upon an H-1B visa. Each H-1B applicant is required to maintain an active employment status with the petitioning company, or to obtain the approval of the Department of Labor and the Bureau of Citizenship and Immigration Services to change jobs. An alien-employee who fails to maintain that employment status falls out of status and is

subject to removal proceedings. In addition, the sponsor company is responsible for the continued employment and salary of the sponsored alien. If the alien has a change of status (by leaving the job) or changes occur in his/her employment, the sponsoring employer is required to notify DHS.

## Overview of Megasystems Inc., MAQ Technologies and their Officers

13. Megasystems, Inc. ("Megasystems") is a Massachusetts-based corporation that was established in November 1997. Megasystems advertises itself as a "specialty services firm providing complete software solutions to its clients" whose goal is to be "universally recognized as providing technical specialty services." The Chief Executive Officer is listed as Abdul Aziz Quraishi.

14. A corporate entity that is related to Megasystems is MAQ Technologies, Inc. ("MAQ Technologies"), previously headquartered at 504 Sherman Street, Canton, Massachusetts, and currently located at 953 N. Plum Grove, Schaumburg, Illinois. Both Megasystems and MAQ Technologies claim to have an office at 953 N. Plum Grove Road, Schaumburg, Illinois. The President of MAQ Technologies is Mohammed Quraishi,[1] also known as Rasheed Quraishi and Mohammed AR

---

[1] On December 17, 1998, the Anti-Fraud Unit, Consulate General of the United States, concluded that Mohammed Quraishi's own H-1B visa application, sponsored by Megasystems, had been obtained through fraud. The Immigration and Naturalization Service subsequently revoked Quraishi's visa on August 3, 1999, but Quraishi remained in the country and actively involved in the

Quraishi.   MAQ Technologies describes itself as a "professional
services firm that delivers IT Solutions through consulting,
outsourcing and strategic staffing."   In addition to claiming the
same Illinois office and to provide the same services, both
Megasystems and MAQ Technologies share an office location and phone
number, and the officers of both companies appear on the other's
payroll statement and both have provided almost identical
employment letters in the H-1B visa applications submitted to the
United States.

### The H-1B Application of CI-1

15.   In June 2004, law enforcement agents interviewed a
Cooperating Individual ("CI-1").   In the interview, CI-1, who is an
alien, said that he/she paid a conduit a large sum of money to
facilitate his/her fraudulent admission to the United States
pursuant to a H-1B visa.   In summary, CI-1 said that MAQ
Technologies falsely represented to the United States that the
company would employ CI-1.   Based on this false representation, an
H-1B visa was issued to CI-1.   He/she entered the United States
with this H-1B visa.   However, CI-1 has never been employed by MAQ
Technologies.

---

operations of both Megasystems and MAQ Technologies, until his
arrest on or about November 19, 2004, on charges including
Encouraging and Inducing Aliens to Come To, Enter, and Reside in
the United States and Witness Tampering.   (United States v.
Quraishi, et al., Criminal Action No. 04-10345-NMG)

16. On November 27, 2000, MAQ Technologies electronically filed an ETA 9035 on behalf of CI-1. The Labor Conditional Application was for a H-1B specialty occupation computer programmer position for a salary of $40,000.00 to $45,000.00. The application was signed by David J. Francis, Vice President of Human Resources, MAQ Technologies, Canton, Massachusetts. The application was approved by the Department of Labor on December 1, 2000.

17. CI-1's immigration visa petition file includes supporting documentation and letters attesting to CI-1's experience, submitted by the president of MAQ Technologies, President Rasheed Quraishi, and dated February 28, 2000. The petition states that CI-1 would be employed as a computer programmer /analyst and would earn a salary of $45,000 a year. The petition was signed by the Vice President for Human Resources David J. Francis, and dated November 15, 2000. On March 12, 2001, INS approved the I-129 petition for a visa based upon documentation submitted by representatives at MAQ Technologies, including the DOL ETA 9035 certification. The visa was valid through January 15, 2004. On May 14, 2001, the Department of State issued CI-1 a United States H-1B Non-immigrant Visa, FOIL Number 43555306. The visa was issued at Chennai, India, and was valid until January 15, 2004. The visa contains petition number 05551007 and reflects MAQ Technologies as the sponsoring company. DHS indices confirm that the visa was used

by CI-1 to enter the United Sates on or about June 10, 2001, at or near New York.

18.    When CI-1 arrived in the United States on or about June 10, 2001, he/she was informed by Rasheed Quraishi that there was no computer job available fcr CI-1 at MAQ/Megasystems. According to CI-1, Rasheed informed CI-1 that MAQ/Megasystemes had a condominium available in Canton (the Walnut Street Condo) where CI-1 could stay and pay rent to Aziz Quraishi. Rasheed instructed CI-1 to stay in the Walnut Street Condo and try to find work by himself/herself. Except for a short visit to Virginia to visit friends sometime during 2001 or 2002, CI-1 lived in the Walnut Street Condo from July 2001 until October 8, 2004.

### The fraudulent employment scheme using the subject accounts

19.    Using the subject accounts, Rasheed engaged CI-1 in a fraudulent employment pay stub/pay back scheme. In July 2004, CI-1 provided law enforcement officers with several fraudulent pay stubs reflecting that he/she worked for MAQ Technologies in Schaumburg, Illinois, as a computer programmer from June 30, 2003 to December 4, 2003. In addition, a review of DOL indices indicate that MAQ Technologies submitted information indicating that CI-1 has been employed at MAQ Technologies in Massachusetts, beginning in 2003. MAQ reported that CI-1 was paid $9000 in the second quarter of 2003; $9000 in the third quarter; $6000 in the fourth quarter; and $9750 in the first quarter of 2004. Despite the information

-10-

reflected on the fraudulent pay stubs and in the reports submitted by MAQ to the government, CI-1 has stated that he/she never worked for MAQ technologies or Megasystems and had never lived or worked in Illinois. In fact, during the time period reflected by the pay stubs, CI-1 had been living in the Walnut Street Condo and had worked as a clerk at a convenience store in Massachusetts.

20.  CI-1 informed law enforcement that the false employment stubs and checks were mailed to him/her from Rasheed who lived in Illinois, and that Rasheed provided CI-1 with a series of fraudulent employment pay stubs and checks drawn on the MAQ account, giving the appearance that CI-1 was a full-time employee of MAQ/Megasystems.  Records for the MAQ Charter One Account reflect that this account was opened on May 7, 2003, by Rasheed.

21.  The MAQ Charter One account was used to make fraudulent payments to CI-1, a purported employee, in order to make it appear that CI-1 was employed by MAQ/Megasystems, allowing CI-1 to maintain his/her visa status and reside in the United States illegally, without being detected by law enforcement.  From on or about June 30, 2003, through December 4, 2003, a total of seven company checks from MAQ Technologies were written on the MAQ Charter One bank account, signed by Rasheed and made payable to CI-1.  The total of these seven checks was $15,875.34.  These checks, purportedly for CI-1's employment by MAQ, have the letterhead of

-11-

MAQ Technologies, indicating its address is 953 North Plum Grove D. Schaumburg, Illinois 60173.

22.  Specifically, the MAQ Charter One account statements reflect that the following checks, all made out to CI-1, were paid from the MAQ Charter One account on the following dates: check 313 for $2,255.57 on August 4, 2003; check 329 for $2,271.99 on September 10, 2003; check 350 for $2,271.99 on October 16, 2003; check 378 for $2,271.99 on November 10, 2003; check 408 for $2,271.99 on December 15, 2003; check 489 for $2,271.99 on January 14, 2004; and, check 447 for $2,259.82 on January 7, 2004.

23.  After having received the purported employment payments from the MAQ Charter One account, CI-1 was instructed to deposit the checks drawn on the MAQ Charter One account into CI-1's own personal account, and then to write checks on CI-1's personal account, made out to Rasheed.  These checks were then deposited into the Rasheed Charter One personal account.  In addition to repaying the purported salary, CI-1 was also required to pay an additional fee to Rasheed, which was also deposited into the Rasheed Charter One personal account.  The total amount of the checks, which were paid by CI-1 to Rasheed and deposited into the Rasheed Charter One personal account was $20,496.65.

24.  CI-1 was instructed to make out these checks to the name of "Mohammed A. Quaraishi."  CI-1 has provided an electronic message dated July 13, 2003, sent to CI-1 by Rasheed Quraishi,

-12-

containing this instruction. The e-mail was entitled "info" and the text stated, in its entirety:

> Check Name: Mohammed A Quaraishi,
>
> Thanks

25. The signature block of the e-mail read:

> Rasheed Quaraishi
> MAQ Technologies Inc.
> 953 N. Plum Grove RD, Suite #D
> Schaumburg, IL 60173
> Ph: 847-619-5009
> Fax: 847-619-5166
> Cell: 781-367-0628
> Email : rasheed@maqtechnologies.com
> Website:www.maqtechnolgies.com

26. In addition, Rasheed instructed CI-1 to break the payments up into separate checks, which were then deposited into the Rasheed Charter One personal account. Based on my training an experience, money launderers often divide deposits into a series of separate checks to avoid detection by law enforcement, and to conceal or disguise the source or nature of the funds.

27. Bank records indicate that from July 23, 2003, through December 29, 2003, seventeen (17) checks, totalling $20,496.65, written by CI-1 and made out to "Mohammed A Quraishi", were deposited into the Rasheed Charter One personal account. All the personal checks that had legible endorsements were signed by Rasheed Quaraishi. The name and signature of Rasheed Quraishi appears on the Bank Deposit Agreement, and appears to be similar to the endorsements on the checks.

-13-

28. Rasheed then engaged in a series of monetary transactions, transferring funds from the Rasheed Charter One personal account to the MAQ Technologies Charter One account. During the period June 20, 2003, to May 14, 2004, $155,718.00 was transferred from the Rasheed Charter One personal account to the MAQ Technologies Charter One Account.

### Extension of CI-1's H-1B Visa

29. CI-1 informed law enforcement that, beginning in December 2003, he/she discussed applying for a fraudulent extension of his/her H-1B visa with Qaiyum Quraishi. Qaiyum indicated that he would assist CI-1 in obtaining a fraudulent visa extension for a fee of $3000. CI-1 provided law enforcement with a $3000 negotiated check from CI-1's account. This check, numbered 210 and dated January 15, 2004, is made payable to MAQ Technologies, Inc. The back of the check reflects the signature of "Qaiyum Quraishi" and indicates that it was deposited at Fleet Bank 9418300677, held in the name of MAQ Technologies Inc./Abdul Aziz Quaraishi and Ather Haq at Fleet Bank (the MAQ Fleet Account).

30. In December 2003, MAQ Technologies submitted Form I-129 for the extension of CI-1's visa, incorporating the fraudulent pay stubs. The paperwork was signed by Samu Thomas, Director of HR, and indicated that CI-1 was presently a computer programmer at MAQ and that the company wanted to continue to employ him/her. The extension was approved on December 30, 2003.

-14-

### *The Walnut Street Condo*

31. In addition, the Quraishi brothers maintained a condominum where they encouraged aliens who were in the United States unlawfully and were purportedly working for MAQ/Megasystems to reside. This condominium was located at 80 Walnut Street, Unit 401, Canton Massachusetts 02021 ("the Walnut Street Condo").

32. On June 25, 2004, as part of this investigation, a federal search warrant was executed at Megasystems. During the course of the search, federal agents discovered a condominium purchase and sales agreement dated August 29, 2000 for the purchase of 80 Walnut Street, Unit 401, Canton, Massachusetts. This document indicated that the purchaser of the property was Megasystems, Inc. The purchase and sale agreement was signed by Rasheed Quraishi.

33. The deed for the Walnut Street Condo, dated September 25, 2000, indicated that the purchaser of the Walnut Street Condo was Aziz Quraishi for a price of $115,000. A mortgage of $92,000 was held by Fleet Mortgage Corporation, who apparently at some point transferred the mortgage to Washington Mutual Bank. The mortgage was discharged on February 4, 2003. The recipient of the discharge was Aziz Quraishi.

34. In April 2003, the Canton police received a report of suspicious activity occurring at the Walnut Street Condo. Neighbors reported frequently observing males described as "Middle Eastern" arriving at and leaving the Walnut Street Condo, often

-15-

carrying laptop computers and attache cases. On April 23, 2003, at approximately 6:00 am, a team consisting of federal and local law enforcement agents arrived at the Walnut Street Condo. A total of eight males were found in the two-bedroom apartment, many of whom were sleeping on mattresses on the floor. All the occupants were questioned for immigration status purposes and all were found to have H-1B visas which were sponsored by Megasystems. The occupants stated that Qaiyum Quraishi was the owner of the Walnut Street Condo and was also the owner of Megasystems. The occupants stated that they each paid approximately $200/month rent for living in the Walnut Street Condo, and that the rent was deducted from their $45,000 a year salaries.

35.  Also on June 25, 2004, Joint Terrorism Task Force Special Agent Galen Nace encountered CI-1 at the Walnut Street Condo. CI-1 informed Nace that he/she was not working for MAQ Technologies and that he/she was working at a convenience store. CI-1 knew that the FBI previously "raided" the Walnut Street Condo before and stated that he/she was not home at the time of the raid. Later, CI-1 stated that he/she had resided in the Walnut Street Condo since 2001 and that Aziz Quraishi was responsible for collecting rent from the foreign nationals living in the Walnut Street Condo. CI-1 further stated that, at any one time, as many as 15 foreign nationals had lived in the Walnut Street Condo.

36.  During the time that CI-1 was involved in the fraudulent employment scheme described above, CI-1 was required to pay $240

-16-

monthly as rent for his residence at the Walnut Street Condo. CI-1 made these rent payments to Aziz Quraishi, who was the record owner of the Walnut Street Condo and the CEO of Megasystems. CI-1 has provided three cancelled checks, two of which were made payable to Aziz Quraishi and one to Abdul Aziz (which is an alias of Aziz Quraishi). Each of these check was in amount of $240. All of the checks were negotiated. Two of the checks are endorsed by Aziz Quraishi, while the other check is endorsed by Qaiyim Quraishi.

### *Aziz's Statements to Law Enforcement Agents on June 25, 2004*

37. On June 25, 2004, federal agents executed a search warrant issued in District of Massachusetts (M.J. No. 04-1803-CBS) at Megasystems Inc., 500 Chapman Street, Canton, Massachusetts. During the execution of this search warrant, Aziz Quraishi was interviewed by FBI Special Agent Robert Doherty and me. After being advised of his rights and verbally waiving those rights Aziz stated that he was the CEO of Megasystems. Aziz indicated that his brother, Rasheed, was the vice-president of the company and his brother, Qaiyum, was the director of human resources. Aziz said that Rasheed currently worked in Illinos for MAQ Technologies. Aziz stated that, originally, MAQ had been part of Megasystems, but asserted that the two were now independent companies. Aziz admitted that the Quraishi brothers had invented a Megasystems corporate officer named "David J. Francis" and had used this fraudulent name on visa applications. Aziz said that the name "David J. Francis" had been chosen because it sounded "American,"

-17-

enabling the visas to be approved more quickly by the government. Aziz further stated that "David J. Francis" had never been an employee of MAQ/Megasystems, and that it was his brother Qaiyum's idea to make up the name. Aziz estimated that the company had filed between 25-50 petitions utilizing the false name of David J. Francis.

38. Furthermore, Aziz admitted that MAQ/Megasystems had assisted between four to five aliens with applying for H-1B visas, although the aliens never worked for MAQ/Megasystems. Aziz stated that they informed the aliens to find some type of work in the computer field. Aziz asserted that he had not charged the aliens a fee, and that this assistance was provided as a courtesy so that the aliens could better themselves in the United States. Aziz admitted that, on some occasions, aliens were provided room and board at the Walnut Street Condo. Aziz stated that the company owned the Walnut Street Condo and was responsible for paying all the expenses for the aliens, and that the aliens had paid nothing. Aziz further stated that the company paid all the rent, food, and lodging for all the aliens that resided at the Walnut Street Condo. Aziz admitted that the Walnut Street Condo was set up solely as a place for workers to stay if they had no place to go. Aziz estimated that approximately 50-70 aliens with H-1B visas had stayed at the Walnut Street Condo over time. Aziz stated that he personally had never lived in the Walnut Street Condo.

-18-

39.  Aziz also admitted to Megasystems/MAQ's participation in the fraudulent employment scheme described above. Aziz indicated that, if aliens wanted to maintain lawful status in the United States, they were sometimes required by INS to show that they had pay stubs from Megasystems. Aziz stated that he would provide certain aliens who did not work for Megasystems with a number of pay stubs, each indicating that they had earned approximately $3,500 from Megasystems. Aziz stated that the figure was based on the $45,000 annual salary that Megasystems had falsely indicated to the government that the alien would earn. Aziz stated that Megasystems would provide up to six months of pay stubs for each alien.   According to Aziz, the aliens would then pay back to Megasystems the money represented by the pay stubs, plus an additional amount purportedly representing taxes.  Aziz claimed that this additional amount was approximately 10-20 percent of the total amount paid.  Aziz estimated that Megasystems had sponsored approximately 300 aliens, and that approximately 180-190 of those aliens were no longer working for Megasystems.  Aziz admitted that he had not reported the change of employment for these aliens to the government.  In addition, Aziz estimated that approximately 10-15 of the aliens sponsored by Megasystems had, in fact, never worked for Megasystems.

40.  When asked for specific names of aliens sponsored for H-1B visas by Megasystems, but who, in fact, had never worked at Megasystems, Aziz provided several names.  Aziz cited employee 127,

-19-

Sanjay Bahugna, who was listed on the Megasystems payroll as having last been paid on October 31, 2003.  Aziz stated that Sanjay came to the United States in 2003, stayed at the Walnut Street Condo for two weeks, but had never worked for Megasystems.

41.  In addition, Aziz admitted that he had assisted 10-20 aliens with applying for extensions for their H-1B visas.  Aziz admitted that these people were not working for Megasystems at the time he assisted them in seeking their extensions.

## Recorded Conversations with Aziz and Qaiyum Quraishi

42.  From September 10 through October 4, 2004, CI-1 met and recorded conversations with Aziz and Qaiyum Quraishi under the direction of law enforcement.  The meetings and recordings took place at Megasystems, 500 Chapman Street, Canton, Massachusetts, and the Quraishi home located 38 Kevin Clancy Way, Stoughton, Massachusetts.  At the meetings, Aziz and Qaiyum discussed visa fraud, money payments, fraudulent documents, and the current problems with the police relating to aliens staying at the Walnut Street Condo.  Several of the meetings focused on Aziz and Qaiyum arranging the continued harboring and smuggling of CI-1 from the United States to India and back into the United States.  CI-1 has informed law enforcement that because of the ongoing investigation the Quraishi brothers wanted to clear out the Walnut Street Condo of all foreign nationals by the first week of October.  According to CI-1, the Quraishi brothers indicated that, because of the

-20-

ongoing problems with law enforcement, they were considering selling the Walnut Street Condo in the near future.

43. All of the aforementioned meetings between CI-1, Aziz, and Qaiyum were monitored and consensually recorded by law enforcement. However, due to equipment failure the first meeting on September 10, 2004, was not successfully recorded. The subsequent meetings were successfully recorded. Because the recordings were in a foreign language, CI-1 was debriefed immediately after each meeting and transcripts were prepared by the FBI. I have reviewed the transcripts and they are consistent with the information provided by CI-1.

44. Prior to these conversations, in late August 2004, CI-1 reported that the Quraishi brothers were concerned about the Walnut Street Condo due to the investigation. Aziz informed CI-1 that he/she would have to leave the Walnut Street Condo, find a new place to live, and possibly leave the United States. On September 14, 2004, Qaiyum unexpectedly approached CI-1 and informed him/her that he/she would have to go back to India. Qaiyum said that it would be best to leave the country because of the investigation and that it would be a good idea for CI-1 to leave the United States for a couple of months, making it appear that CI-1 was taking an extended vacation in India. Qaiyum instructed CI-1 that when he/she returned from India, he/she should go directly to Chicago, because that is where he/she was purportedly employed by MAQ Technologies. Qaiyum further assured CI-1 that if the police

-21-

inquired as to his/her location, Qaiyum would say that CI-1 was on vacation in India.   On September 24, 2004, in a recorded conversation, Qaiyum told CI-1 that Qaiyum would purchase an airline ticket for CI-1 with the $2000 that CI-1 had previously given Qaiyum for a green card.  Qaiyum, however, required CI-1 to write a blank check for the ticket so it would appear that the CI-1 had paid for the ticket with money from CI-1's checking account. When CI-1 told Qaiyum that there was not enough money in his/her checking account to cover the check, Qaiyum said that he would deposit money into CI-1's account to cover the check.

45.   On October 4, 2004, a cash payment of $2000 was deposited into CI-1's checking account.

### *Federal Civil Seizure Warrant*

46.   On November 1, 2004, a civil seizure warrant was issued by United States Magistrate Charles B. Swartwood, III, United States District Court for the District of Massachusetts.   This warrant authorized the seizure of the following:

- The contents of bank account 8620008235, held in the name MAQ Technologies, Inc./Mohammed A.R. Quaraishi, at Charter One Bank, NA. (the MAQ Charter One account); and

- The contents of bank account 8620398000, held in the name of Mahammed A.R. Quaraishi, at Charter One Bank, NA (the Rasheed Charter One personal account).

48.   On November 2, 2004, Charter One Bank closed the two accounts, pursuant to the civil seizure warrant.   In compliance with the seizure warrant, two checks were made payable to U.S. Immigration and Customs Enforcement, as follows: 1) Check No.

15067389 in the amount of $4,468.18 representing the balance in account number 08620398000; and, 2) Check No. 15067388 in the amount of $103,324.22, representing the balance in account number 08620008235.   The two checks, totaling $107,792.40, were turned over to the Fines, Penalties, and Forfeitures Office of U.S. Customs and Border Protection, and the seized currency has been deposited in a suspense account until the resolution of this forfeiture action.

## Federal Criminal Indictment

49.   On November 18, 2004, a federal grand jury sitting in the District of Massachusetts returned a Five-Count Indictment charging Mohammed Abdul Rasheed Quraishi, Mohammed Abdul Qayium Quraishi, and Mohammed Abdul Aziz Quraishi, with:  Encouraging and Inducing Aliens to Come To, Enter, and Reside in the United States in Violation of Law, in violation of 8 U.S.C. §1324; Witness Tampering, in violation of 18 U.S.C. §1512(b)(3); and Aiding and Abetting, in violation of 18 U.S.C. §2, *United States v. Quraishi, et al.*, Criminal Action No. 04-10345-NMG.   The Indictment also included a Forfeiture Allegation that provided that as result of committing one or more of the offenses alleged in Counts One, Two and Three of the Indictment, the defendants, upon conviction, shall forfeit to the United States, pursuant to 18 U.S.C. §982(a)(6)(A), any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense; and any property real or personal

-23-

that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense; or that is used to facilitate, or is intended to be used to facilitate the commission of the offense.

### Conclusion

50.   In conclusion, based on the information provided in this affidavit, I have probable cause to believe that the above-described Defendant Accounts were involved in and were used to conduct and to facilitate money laundering activities, in violation of 18 U.S.C. §1956 and therefore, are subject to seizure and forfeiture to the United States, pursuant to 18 U.S.C. §981(a)(1)(A).

Signed under the pains and penalties of perjury this 18th day of March, 2005.

Richard M. Deasy,
Supervisory Special Agent
United States Bureau of Immigration
and Customs Enforcement